UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
UNITED STATES OF AMERICA                        20 CR 160 (MKV)

                                                ECF

-against-


ERICA GARCIA
--------------------------------------------------------x


**MEMORANDUM OF LAW IN SUPPORT OF ERICA GARCIA'S
MOTION TO SUPPRESS THE SEARCHES OF HER TRUCK AND CELL PHONE**


Deborah Colson
Colson Law PLLC
80 Broad Street, 19th Floor
New York, New York 10004
*Attorney for Erica Garcia*

## Table of Contents

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 2

    A.  Erica Garcia ............................................................................................................... 2

    B.  The Search Warrant Applications .............................................................................. 3

        1.  *Application to Search Dr. Garcia's Truck* ........................................................ 3

        2.  *Application to Search Dr. Garcia's Phone* ...................................................... 5

LEGAL FRAMEWORK .......................................................................................................... 7

    A.  Probable Cause ........................................................................................................... 7

    B.  Warrant Staleness ...................................................................................................... 7

    C.  Good Faith Exception ................................................................................................ 8

    D.  Franks Hearing ........................................................................................................... 8

ARGUMENT ........................................................................................................................ 10

    A.  The Evidence Presented in the Warrant Applications Was Stale ............................ 10

    B.  The Warrant Applications Contained Material Omissions and Misstatements Made in Reckless Disregard for the Truth ............................................................................. 11

        1.  *The Omissions and Misstatements* ................................................................ 12

        2.  *Materiality* ...................................................................................................... 15

    C.  Agents Continued to Demonstrate a Lack of Good Faith During the Search of Dr. Garcia's Truck .......................................................................................................... 16

CONCLUSION ..................................................................................................................... 17

I

# Table of Authorities

**Cases**

*Davis v. United States,* 564 U.S. 229 (2011) ................................................................ 8

*Franks v. Delaware,* 438 U.S. 154 (1978) ............................................................. 1, 8, 9

*Illinois v. Gates,* 462 U.S. 213 (1983) ...................................................................... 7

*Rivera v. United States,* 728 F.Supp. 250 (S.D.N.Y. 1990) ................................... 9, 14

*Rivera v. United States,* 928 F.2d 592 (2d Cir. 1991) ........................................... 9, 12

*United States v. Awadallah,* 349 F.3d 42 (2d Cir. 2003) .................................. 8, 9, 13

*United States v. Boles,* 914 F.3d 95 (2d Cir. 2019) ................................................... 8

*United States v. Falso,* 544 F.3d 110 (2d Cir. 2008) ................................................. 7

*United States v. Keith,* 183 F.Supp.3d 427 (S.D.N.Y. 2016) ................................... 10

*United States v. Lahey,* 967 F.Supp.2d 698 (S.D.N.Y. 2013) ................................. 15

*United States v. Leon,* 468 U.S. 897 (1984) ........................................................ 1, 8

*United States v. Levy,* 11 Cr. 62 (PAC), 2012 WL 5830631 (S.D.N.Y. Nov. 16, 2012) ............... 9

*United States v. Martino,* 664 F.2d 860 (2d Cir. 1981) .............................................. 8

*United States v. Nejad,* 436 F.Supp.3d 707 (S.D.N.Y. 2020) ................................... 9

*United States v. Paul,* 692 F.Supp. 186 (S.D.N.Y. 1988) ......................................... 11

*United States v. Rajaratnam,* 719 F.3d 139 (2d Cir. 2013) ................................... 9, 16

*United States v. Raymonda,* 780 F.3d 105 (2d Cir. 2015) ................................... passim

*United States v. Shi Yan Liu,* 239 F.3d 138 (2d Cir. 2000) ................................... 2, 16

*United States v. Wagner,* 989 F.2d 69 (2d Cir. 1993) ................................... 1, 7, 8, 10

*United States v. Wilbert,* 818 Fed.Appx. 113 (2d Cir. 2020) ................................... 10

*Walczyk v. Rio,* 496 F.3d 139 (2d Cir. 2007) ............................................................ 7

Dr. Erica Garcia is charged in Count One of a five-count indictment with conspiring to purchase, distribute and administer misbranded and adulterated drugs. She respectfully submits this memorandum of law in support of her motion, pursuant to the Fourth Amendment, to suppress physical evidence seized from her truck and cell phone and any evidence derived therefrom.

## I.

## PRELIMINARY STATEMENT

In March 2020, eleven months after Dr. Garcia was intercepted on calls discussing equine drugs with her boss, Jorge Navarro, the government obtained search warrants for Dr. Garcia's truck and cell phone and seized additional evidence against her. Her 2019 calls with Navarro formed the centerpiece of the government's warrant applications. The government claimed that the calls showed Dr. Garcia's use of two performance-enhancing drugs ("PEDs") on racehorses trained by Navarro: "Monkey" and "Red Acid." Yet that evidence was stale. Navarro fired Dr. Garcia in early April 2019 and ceased contact with her. Thus, by the time agents sought the truck and phone warrants, she had not spoken to Navarro or treated his horses in almost a year. Accordingly, the government failed to establish probable cause that evidence of a crime would be found in Dr. Garcia's truck or phone "*as of the time of the search[es].*" *United States v. Raymonda,* 780 F.3d 105, 114 (2d Cir. 2015) (emphasis in original) (quoting *United States v. Wagner,* 989 F.2d 69, 75 (2d Cir. 1993)).

The good faith exception does not apply because the warrant applications contained material omissions and misstatements made in reckless disregard for the truth. *See United States v. Leon,* 468 U.S. 897 (1984); *Franks v. Delaware,* 438 U.S. 154 (1978). Most notably, the applications omitted to state that the government lacked a scientific basis to assert that Monkey and Red Acid were performance enhancing. (Indeed, the government still lacks such evidence).

1

Because the government failed to establish probable cause and cannot claim the benefit of the good faith exception, suppression is required under the Fourth Amendment. In the alternative, the Court should hold a *Franks* hearing to determine the totality of circumstances surrounding the applications.

The agents' lack of good faith continued during their search of Dr. Garcia's truck. Agents seized many dozens of items outside the scope of the warrant and demonstrated a "flagrant disregard" for its limitations, providing another basis for wholesale suppression of the truck search. *United States v. Shi Yan Liu,* 239 F.3d 138, 140 (2d Cir. 2000).

## II.
## STATEMENT OF FACTS

### A.  Erica Garcia

Erica Garcia is a veterinarian licensed to practice in the State of Florida. Affidavit of Erica Garcia ("Garcia Aff.") ¶ 1. Prior to her arrest on March 6, 2020, Dr. Garcia worked simultaneously for various racehorse trainers in Dade, Broward and Palm Beach Counties. *Id.* at ¶ 2. In early 2019, one of her employers was co-defendant Jorge Navarro. *Id.* Among other activities, Dr. Garcia examined and diagnosed racehorses trained by Navarro, administered medications, and referred injured horses for treatment and surgery. *Id.* at ¶ 3. Navarro fired Dr. Garcia in April 2019 after his barn was placed on quarantine because she directed an employee to report a sick horse to the state authorities. *Id.* at ¶ 4.

**B. The Search Warrant Applications**

1. *Application to Search Dr. Garcia's Truck*

On March 6, 2020, FBI Special Agent Timothy Bergen swore out an affidavit in support of an application for a warrant to search various locations, including Dr. Garcia's Chevrolet Suburban truck. *See* Declaration of Timothy Bergen ("Bergen Aff.") (March 6, 2020), attached as Ex. A to Affirmation of Deborah Colson (July 29, 2021) ("Colson Aff.").[1] In his affidavit, Bergen described an ongoing FBI investigation "into various fraudulent schemes centered around professional horseracing and the gambling, sale, and breeding of race horses." Bergen Aff. ¶ 5. He also asserted that targets of the investigation had "engaged in repeated efforts to obtain, distribute, or administer prohibited substances for use in doping horses that they each train[ed], race[d], or treat[ed]." *Id.*

Bergen identified Dr. Garcia as a "veterinarian who has historically sourced, distributed and administered PEDs to racehorses" at the direction of trainer Jorge Navarro. *Id.* at ¶ 10(b). He alleged that she "did not practice medicine in order to examine, diagnose, and treat legitimate health problems in NAVARRO's horses, but rather to secretly administer adulterated and misbranded PEDs to those horses." *Id.* He also stated that Dr. Garcia sometimes "took direction from NAVARRO" and sometimes administered the PEDs "unprompted," then "informed NAVARRO after the fact." *Id.*

Based on his "participation in the investigation, including [his] review of intercepted communications and discussions with agents," Bergen listed two PEDs in particular that he claimed Dr. Garcia had used: (1) an alleged anti-inflammatory known "Red" or "Red Acid" and (2) an alleged "blood builder" known as "Monkey." *Id.* at ¶ 10(b), n. 5-6. Bergen did not define

---

[1] In compliance with the protective order issued in this case, exhibits to the Colson Affirmation have been filed under seal.

the term "performance-enhancing" or offer any scientific evidence to support his claim that Red Acid and Monkey qualified as PEDs.

Bergen asserted that Dr. Garcia had been intercepted on multiple calls and text messages between January and April 2019 talking with Navarro about the administration of these substances. *Id.* at ¶ 10(b). He described a January 14, 2019 call, for example, during which Navarro told Dr. Garcia to "hit" certain horses with "Monkey." *Id.* at ¶ 17. In two additional January 2019 conversations, they discussed using "red." *Id.* at ¶¶ 18-19.

Bergen acknowledged that Navarro and Dr. Garcia had "part[ed] ways" in early 2019. *Id.* at ¶ 10(b). But he did not disclose that she had been fired or explain the reason for her termination. Instead, he alleged that she "continue[d] to practice veterinary medicine" after separating from Navarro and to "store veterinary equipment and what appear to be bottles of drugs" in her truck. *Id.* He also stated that, on February 11, 2020, agents saw Dr. Garcia and an unidentified individual carry boxes to her truck, enter the truck, and drive away. *Id.* at ¶ 43.

Finally, Bergen asserted that Dr. Garcia "continued to remain in touch with people connected with NAVARRO, including NAVARRO's assistant trainer and two individuals who own[ed] horses trained by NAVARRO." *Id.* at ¶ 10(b). Bergen claimed that Dr. Garcia spoke with these individuals over the phone in January 2020, *id.,* but he did not name the individuals, describe the substance of their conversations, or offer any evidence linking them to Navarro's wrongdoing.

Based on (1) his "training and experience and …participation in this investigation," (2) "the frequency and regularity with which GARCIA has administered PEDs to NAVARRO's horses," and (3) the fact "that veterinarians often travel to barns, stables, or racetracks to examine horses," Bergen concluded that Dr. Garcia stored drugs in her truck and that those drugs were

likely "to be PEDs." *Id.* at ¶ 43. Accordingly, he formally requested permission to search the truck for evidence of four subject offenses: mail fraud, wire fraud, conspiracy to commit mail and wire fraud, and misbranding of drugs and devices. *Id.* at ¶ 4.

United States Magistrate Judge Lurana Snow approved the government's application and issued a warrant. *See* Truck Warrant, attached as Exhibit B to Colson Aff. The warrant permitted the seizure of misbranded and adulterated drugs and associated ingredients and paraphernalia. *Id.* at Attachment B, ¶ 7. It did not allow agents to seize FDA-approved vitamins or medications.

Agents searched Dr. Garcia's truck on March 9. 2020, and took everything inside. The search inventory lists 222 items, including many dozens of FDA-approved vitamins and medications. *See* Inventory of Items Seized, attached as Exhibit C to Colson Aff.

2. *Application to Search Dr. Garcia's Phone*

On March 27, 2020, FBI Special Agent Bruce Turpin swore out an affidavit in support of an application for a warrant to search eight cellular telephones, including Dr. Garcia's iPhone 11 seized incident to her arrest on March 9, 2020. *See* Declaration of Bruce Turpin (March 27, 2020) ("Turpin Aff."), attached as Exhibit D to Colson Aff. Turpin began by referencing the same ongoing FBI investigation into "various fraudulent schemes centered around professional horseracing" discussed in the truck warrant application. Turpin Aff. ¶ 7. He also provided the same description of Dr. Garcia, specifically that she was a "veterinarian who has historically sourced, distributed and administered PEDs to race horses" at Navarro's direction. *Id.* at ¶ 10(b). Turpin mentioned that Dr. Garcia had been intercepted on calls and text messages with Navarro in early 2019, discussing the administration of PEDs, including "Red Acid" and "Monkey." *Id.* He further explained that she and Navarro had since "part[ed] ways." *Id.*

5

Like Bergen, Turpin claimed that Dr. Garcia continued to remain in touch with certain Navarro associates, "including NAVARRO's assistant trainer HENDRICK CHEN [who she spoke with] as recently as January 19, 2020, as well as two individuals who own horses trained by NAVARRO." *Id.* He did not name the horse owners or offer any evidence linking Chen or the owners to Navarro's misconduct.

Turpin asserted that "individuals who engage in professional training and competitive racing of thoroughbred horses, and the procurement and administration of adulterated and misbranded substances" store material information on their phones, including text messages, emails, contact information and records of illegal purchases and transactions. *Id.* at ¶ 13. He also stated that computer files and remnants "can be recovered months or even years after they have been created." *Id.* at ¶ 14. Thus, he formally requested permission to search Dr. Garcia's iPhone 11 for evidence of the same offenses named in the truck warrant: mail fraud, wire fraud, conspiracy to commit mail and wire fraud, and misbranding of drugs. *Id.* at ¶ 6. The specific categories of evidence sought were outlined in Attachment A and included all evidence of communications regarding a scheme to obtain, distribute, and administer adulterated and/or misbranded drugs. *Id.* at Attachment A.

United States Magistrate Judge Sarah Cave approved the government's application to search Dr. Garcia's cell phone and issued a warrant. *See* Phone Warrant, attached as Exhibit E to Colson Decl. The government produced a mirror image of Dr. Garcia's phone to the defense on July 8, 2020.

## III.

## LEGAL FRAMEWORK

### A.  Probable Cause

The Fourth Amendment guarantees individuals the right "to be secure in their persons,
houses, papers and effects, against unreasonable searches and seizures," and provides that "no
Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly
describing the place to be searched, and the persons or things to be seized." U.S. Const., Amend.
IV.

Probable cause "is a fluid concept—turning on the assessment of probabilities in
particular factual contexts," and as such is not "readily, or even usefully, reduced to a neat set of
legal rules." *United States v. Falso,* 544 F.3d 110, 117 (2d Cir. 2008) (quoting *Illinois v. Gates,*
462 U.S. 213, 232 (1983)). In evaluating probable cause, a judge must "make a practical,
common-sense decision whether, given all the circumstances set forth in the affidavit before
h[er], ... there is a fair probability that contraband or evidence of a crime will be found in a
particular place." *Id.* (quoting *Gates,* 462 U.S. at 238). A warrant is invalid where the
magistrate's "probable-cause determination reflect[s] an improper analysis of the totality of
circumstances." *Id.* (citation and internal quotation marks omitted).

### B.  Warrant Staleness

Probable cause must "exist *as of the time of the search*." *Raymonda,* 780 F.3d at 114
(italics in original) (quoting *Wagner,* 989 F.2d at 75). When the information presented in a
warrant application is not "sufficiently close in time to the issuance of the warrant," then "the
facts supporting criminal activity have grown stale," and the warrant lacks probable cause. *Id.*
(quoting *Wagner,* 989 F.2d at 75). There is "no bright-line rule for staleness." *Walczyk v. Rio,*
496 F.3d 139, 162 (2d Cir. 2007). It must be evaluated "on the basis of the facts of each case."

*United States v. Martino,* 664 F.2d 860, 867 (2d Cir. 1981). The two principle factors in assessing staleness are "the age of th[e] facts and the nature of the conduct alleged." *Id.* at 867. If the affidavit "establishes a pattern of continuing criminal activity," such that "there is reason to believe that the cited activity was probably not a one-time occurrence," the passage of time between the last alleged event and the warrant application is less significant. *Wagner,* 989 F.2d at 75.

### C.  Good Faith Exception

"When an officer genuinely believes that he has obtained a valid warrant … and executes that warrant in good faith, there is no conscious violation of the Fourth Amendment," even if the warrant lacks probable cause. *Raymonda*, 780 F.3d at 118 (citing *Leon,* 468 U.S. at 921). "For an officer to be able to claim the benefits of the good faith exception, however, his reliance on a warrant must be objectively reasonable." *United States v. Boles,* 914 F.3d 95, 103 (2d Cir. 2019). The good faith exception does not apply where "'the issuing magistrate has been knowingly misled,'" *see id.*, "by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth," *Leon,* 468 U.S. at 923. "When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs" of suppression. *Davis v. United States,* 564 U.S. 229, 238 (2011) (citation omitted).

### D.  Franks Hearing

A defendant may, "[i]n certain circumstances … challenge the truthfulness of factual statements" made in a warrant affidavit. *United States v. Awadallah,* 349 F.3d 42, 64 (2d Cir. 2003) (citing *Franks*, 438 at 164-72). To obtain a *Franks* hearing, a defendant must make a "substantial preliminary showing" that (1) the affidavit included misrepresentations or omissions

that were made with a knowing or reckless disregard for the truth; and (2) those misrepresentations or omissions were material, meaning "necessary to the [issuing] judge's probable cause [or necessity] finding." *United States v. Rajaratnam,* 719 F.3d 139, 146-47 (2d Cir. 2013) (alterations in original) (quoting *United States v. Canfield,* 212 F.3d 713, 717-18 (2d Cir. 2000)). To satisfy this test, "a defendant must 'point out specifically the portion of the warrant affidavit that is claimed to be false.'" *United States v. Levy,* 11 Cr. 62 (PAC), 2012 WL 5830631, at *5 (S.D.N.Y. Nov. 16, 2012) (quoting *Franks*, 438 U.S. at 171).

"The reviewing court must be presented with credible and probative evidence" that a misstatement or omission "was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *Rajaratnam,* 719 F.3d at 154 (alteration in original) (quoting *Awadallah,* 349 F.3d at 68). Reckless disregard for the truth may be established by demonstrating that an affiant made "statements which failed to take account of the facts as he knew them, or which he seriously doubted were true." *Rivera v. United States,* 728 F.Supp. 250, 258 (S.D.N.Y. 1990), *aff'd in relevant part, Rivera v. United States,* 928 F.2d 592 (2d Cir. 1991). Where omissions are concerned, courts may also consider "whether the omitted information was 'clearly critical' to the probable cause determination." *Rivera*, 928 F.2d at 604. *See also Rajaratnam,* 719 F.3d at 154 (reckless disregard "can sometimes be *inferred* from the omission of critical information in a wiretap application") (italics in original).

"[C]ourts 'gauge materiality by a process of subtraction' or addition depending on whether misstatements or omissions are at issue." *United States v. Nejad,* 436 F.Supp.3d 707, 719 (S.D.N.Y. 2020) (quoting *Awadallah,* 349 F.3d at 65). "In other words, to determine materiality, courts should 'disregard the allegedly false statements,' 'insert the omitted truths,'

9

and determine whether 'there remains a residue of independent and lawful information sufficient to support probable cause.'" *Id.* (citations omitted).

## IV.

## ARGUMENT

### A.  The Evidence Presented in the Warrant Applications Was Stale

The warrant applications failed to establish probable cause because the evidence presented was stale. Agents did not search Dr. Garcia's truck and phone until March 2020, eleven months after she was fired. Indeed, by the time the searches were conducted, she had not spoken to Navarro or treated his horses in almost a year. *See Raymonda,* 780 F.3d at 116-17. (defendant's access of pornographic website nine months earlier did not establish probable cause that he still possessed child pornography at the time of the search).

The applications also lacked evidence that Dr. Garcia had engaged in "a pattern of continuing criminal activity." *Raymonda,* 780 F.3d at 114 (quoting *Wagner,* 989 F.2d at 75); *see also United States v. Wilbert,* 818 Fed.Appx. 113, 115 (2d Cir. 2020) (summary order) (application alleging defendant's prior sex offense and previous child pornography investigation not stale). They failed to show that she had a history of administering Red Acid or Monkey before working for Navarro or that she continued using these drugs following her termination. In fact, they neglected to contain any evidence at all that she had *ever* used an illegal drug in *any* other context, either on her own or for another trainer. *Compare United States v. Keith,* 183 F.Supp.3d 427, 433 (S.D.N.Y. 2016) (application alleging defendant's extensive history of viewing and receiving child pornography not stale) *with Raymonda*, 780 F.3d at 117 (application stale because it lacked evidence that defendant collected child pornography or was likely to retain images); *see also Wagner,* 989 F.2d at 75 (application stale because it failed to link defendant to ongoing drug conspiracy); *United States v. Paul,* 692 F.Supp. 186, 192-93

(S.D.N.Y. 1988) (application stale because defendant's illegal activity spanned just eight months and ended five months before application was sought).[2]

At best, Bergen proved that Dr. Garcia continued to work as a veterinarian after separating from Navarro. *See* Bergen Aff. ¶ 41 (using cellphone location evidence to show that Dr. Garcia was in the vicinity of a racetrack in February 2020). But he could not say who she worked for, what horses she treated, or what drugs she used. Both Bergen and Turpin also alleged that Dr. Garcia communicated with several Navarro associates in January 2020. Yet they made no effort to link these individuals to Navarro's misconduct or to describe the nature or purpose of the communications. That Dr. Garcia spoke with unidentified individuals about unknown subjects proves nothing.

Accordingly, the information presented in the warrant applications was "not sufficiently close in time" to create a fair probability that evidence of a crime would be found "*as of the time of the search[es]*." *Raymonda,* 780 F.3d at 114. In other words, by the time agents sought the warrants, the facts supporting probable cause had grown stale.

**B. The Warrant Applications Contained Material Omissions and Misstatements Made in Reckless Disregard for the Truth**

The government cannot claim the benefit of the good faith exception because the warrant applications contained material omissions and misstatements made in reckless disregard for the truth.

---

[2] The type of evidence seized from Dr. Garcia's truck also weighed against a finding of probable cause. Drugs of all kinds are easily disposable and transportable and, if unused, they will eventually expire. Thus, it was highly unlikely that Dr. Garcia would store illegal drugs in her truck for any significant length of time, not to mention eleven months. *See Paul,* 692 F.Supp. at 193 (unreasonable to infer that defendant suspected of extortion would keep cash proceeds of his illegal behavior in one place for five months).

11

1. *The Omissions and Misstatements*

The warrant applications each contained two significant omissions. First, the government neglected to disclose that it lacked scientific support for its claim that Monkey and Red Acid were performance enhancing. The government failed to perform laboratory tests before it filed the applications to determine whether the drugs contained banned substances. Colson Aff. ¶ 9. Nor did it retain a scientific expert to opine on the drugs' potential performance-enhancing effects. *Id.* [3] Despite this lack of scientific evidence, Bergen and Turpin categorized both drugs as "PEDs." The government's recklessness may be inferred because the omitted information was "clearly critical" to the probable cause determination. *Rivera*, 928 F.2d at 604. Unless Monkey and Red Acid qualified as performance enhancing, the government had no basis to allege Dr. Garcia's participation in a scheme to dope Navarro's horses.[4]

The second omission concerned Dr. Garcia's termination. Bergen and Turpin both noted that she and Navarro had "parted ways" in 2019, but they neglected to disclose that she was fired or to explain the reason why, namely that she advised a colleague to report a sick horse to the

---

[3] Notably, more than a year later, the government still lacks sufficient evidence to prove that Monkey and Red Acid are performance enhancing. The government still has not tested either substance, and while it has retained an expert, her findings are inconclusive. Colson Aff. ¶ 10. In one report, the expert states that Red Acid is "rumored" to contain Rifampin, but "there is no evidence in the scientific literature that rifampin has any analgesic activity." Colson Aff. ¶ 11. In a second report, she discusses a Red Acid product sold on racehorsemeds.com and states that the company claims the product promotes joint repair but "provides no evidence or references to prove" it. Colson Aff. ¶ 12. The expert does not opine on Monkey specifically, but she does discuss cobalt, which the government alleges is one of Monkey's key ingredients. The expert states that "there is little evidence that supraphysiological doses of cobalt can enhance a horse's athletic performance, although in theory it is possible." Colson Aff. ¶ 13.

[4] Bergen's affidavit included a text exchange in which Dr. Garcia referenced Navarro's use of a third drug called SGF-1000. Bergen Aff. ¶ 22 ("It cheaper than what you do with the sgf 1000."). While Bergen never explicitly alleged that Dr. Garcia had administered SGF-1000, *see id.* at ¶ 10(b), it bears noting that the government also lacked a scientific basis for categorizing this drug as a PED. Colson Aff. ¶ 14.

state. The government must have known about Dr. Garcia's termination and the circumstances surrounding it because Navarro was intercepted on multiple calls maligning her to his colleagues and friends. Colson Aff. ¶ 15.

"An affiant cannot be expected to include … every piece of information gathered in the course of an investigation." *Awadallah*, 349 F.3d at 67-68 (citation and internal quotations omitted). Here, however, recklessness may be inferred because the omitted information was critical to the probable cause analysis. Dr. Garcia's termination demonstrated her total and permanent break with Navarro, thus highlighting the staleness of their 2019 calls. Moreover, her decision to report the sick horse undermined the government's claim that she practiced medicine solely to administer PEDs.

In addition to the omissions described above, the truck application contained two significant misstatements. First, Bergen falsely suggested that Dr. Garcia continued to administer PED's "up to the date" of his affidavit, despite a lack of evidence to support his claim. In paragraph 11 of his affidavit, Bergen wrote:

> As described above, NAVARRO, SERVIS, and GARCIA *have been intercepted on multiple calls indicating that they routinely administer* PEDs to racehorses under their control. Based on the frequency and regularity with which they *discuss a*dministering PEDs to racehorses, I believe that NAVARRO, SERVIS and GARCIA, *have continued to source, transport, store and administer PEDs to racehorses under their control up to the date of this Affidavit.*

Bergen Aff. ¶ 11 (emphasis added). Dr. Garcia was not intercepted on a single call following her termination in April 2019. However, by grouping her with Navarro in the above paragraph, and discussing their activities and calls in the present tense (they "discuss" and they "routinely administer"), Bergen misled the court into believing that her alleged misconduct continued "up to the date" of the applications.

Second, Bergen erroneously asserted that Dr. Garcia "did not practice medicine in order to examine, diagnose, and treat legitimate health problems in NAVARRO's horses," *id.* at ¶ 10(b), even though he possessed substantial evidence to the contrary. Not only did she report the sick horse, but during various calls intercepted before her termination, she diagnosed other horses, discussed her examinations of the horses, interpreted x-rays, and made suggestions about treatments and medications. For example:

- During a call with Navarro on January 27, 2019, Dr. Garcia refused to place a nerve block on a horse who was not lame;

- During text exchanges on January 27, 2019, Navarro reminded Dr. Garcia to send x-rays of a horse to "Lugo," a veterinarian at Ocala Equine Hospital. Dr. Garcia responded: "Already done and already spoke with him."

- During a call on February 10, 2019, Dr. Garcia interpreted x-rays of a horse's ankles and informed Navarro that the horse's right ankle bone was diseased. She advised Navarro to watch the horse. He asked her to treat the horse with Adequan, an FDA-approved drug for the treatment of degenerative joint disease, and she agreed.

- During a call on February 12, 2019, Dr. Garcia reported that a horse had a defect in his condyle, a bone in the lower leg. She said that it could be a pre-fracture and advised sending the horse to "Lugo," the veterinarian at Ocala Equine Hospital. She predicted that the horse may need a screw.

- During a call on March 2, 2019, Dr. Garcia diagnosed the horse XY Jet, suggested he had thickening in his left tendon, and said that she wanted to look at him again the next day.

- During a call on March 15, 2019, Dr. Garcia diagnosed three horses, including XY Jet and suggested treating XY Jet with Baytril, an FDA-approved drug used to treat infections.

Colson Aff. ¶ 16. The government intercepted these calls more than a year before Bergen drafted the truck affidavit. As such, he failed "to take account of the facts as he knew them," and his recklessness may be inferred. *Rivera,* 728 F. Supp. at 258.

14

2.  *Materiality*

Disregarding the false statements and inserting the omitted truths, the warrant

applications lacked "independent and lawful information sufficient to support probable cause."

*Nejad*, 436 F.Supp.3d at 719. As an example, the hypothetical corrected truck affidavit would

read as follows:

- "GARCIA was intercepted on multiple calls discussing with NAVARRO GARCIA's administration of PEDs, including the misbranded and/or adulterated PEDs 'monkey' and 'red,' also known as 'red acid' to horses under NAVARRO's care. *Red acid and monkey have not been tested in a laboratory to determine whether they contain banned or performance-enhancing substances, and the FBI has not retained a scientific expert to opine on their possible performance-enhancing effects."* Bergen Aff. ¶10(b) (passage in italics inserted).

- As described above, NAVARRO, SERVIS, and GARCIA … *were* intercepted on multiple calls *in early 2019* indicating that they routinely administer PEDs to racehorses under their control. *But NAVARRO fired GARCIA eleven months ago, and she has not spoken to him or treated his horses in nearly a year.* Bergen Aff. ¶ 11 (ellipses reflect a deletion; passage in italics inserted).

- GARCIA did not practice medicine in order to examine, diagnose, and treat legitimate health problems in NAVARRO's horses. *That said, she was intercepted on multiple calls diagnosing injuries and illnesses in NAVARRO's horses and suggesting legitimate treatments and medications.* Bergen Aff. ¶ 10(b) (passage in italics inserted).

The corrected affidavit provides a "thin reed" on which to base the searches of Dr.

Garcia's truck and cell phone. *United States v. Lahey,* 967 F.Supp.2d 698, 724 (S.D.N.Y. 2013).

Indeed, the cumulative effect of the corrections is to eliminate nearly every indicator of probable

cause. Had the reviewing magistrates known the government lacked scientific proof that Monkey

and Red Acid were performance enhancing, they would have deemed the evidence insufficient to

establish Dr. Garcia's participation in a scheme to defraud. Moreover, even assuming they found

sufficient evidence of Dr. Garcia's misconduct while employed for Navarro, had they known the

circumstances of her termination, they would have been less inclined to believe her wrongdoing continued after she and Navarro parted ways.

The additional misstatements in the truck warrant further misled Magistrate Snow by obscuring the timing of Dr. Garcia's calls with Navarro and mischaracterizing the nature and character of her work. Had Magistrate Snow understood that Dr. Garcia treated legitimate health problems in Navarro's horses, and that their calls ended in April 2019, she would have further questioned the government's assumption that Dr. Garcia continued to administer PEDS "up to the date of this Affidavit."

Because the omissions and misstatements were material, the government cannot claim the benefit of the good faith exception, and the warrants should be suppressed. In the alternative, Dr. Garcia has made a "substantial preliminary showing" of materiality sufficient to warrant a *Franks* hearing. *Rajaratnam,* 719 F.3d at 146-47.

### C. Agents Continued to Demonstrate a Lack of Good Faith During the Search of Dr. Garcia's Truck

The agents' lack of good faith continued during their search of Dr. Garcia's truck. Agents conducted a widespread seizure of evidence far beyond the warrant's scope. In fact, they emptied the truck, taking every drug inside, including many FDA-approved vitamins and medications. Agents' "flagran[t] disregard" for the terms of the warrant provides an independent basis for wholesale suppression of the truck search. *Shi Yan Liu,* 239 F.3d at 140; *id.* at 141 ("The rationale for blanket suppression is that a search that greatly exceeds the bounds of a warrant and is not conducted in good faith is essentially indistinguishable from a general search.").

## V.

## CONCLUSION

For the reasons above, the Court should suppress the evidence seized from Dr. Garcia's truck and cell phone, and any evidence derived therefrom.

New York, N.Y.
July 29, 2021

/s/
_____

Deborah Colson
*Attorney for Erica Garcia*

17