UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
UNITED STATES OF AMERICA                              20 CR 160 (MKV)

                                                      ECF

-against-


ERICA GARCIA
---------------------------------------------------------x




**MEMORANDUM OF LAW IN SUPPORT OF ERICA GARCIA'S
MOTION TO SUPPRESS WIRETAP EVIDENCE**




                              Deborah Colson
                              Colson Law PLLC
                              80 Broad Street, 19th Floor
                              New York, New York 10004
                              *Attorney for Erica Garcia*

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ..................................................................................................... 3

   A.  **The Nick Surick Wiretap Application** ................................................................. 3

   B.  **The Jorge Navarro Wiretap Application** .......................................................... 6

      1.  *Probable Cause Allegations* ......................................................................... 6

      2.  *Necessity Allegations* .................................................................................. 10

      3.  *Extension Applications* ................................................................................ 12

         a.  <u>February Application</u> ......................................................................... 12

         b.  <u>March Application</u> .............................................................................. 14

         c.  <u>April and Early May Applications</u> ...................................................... 15

         d.  <u>Late May Application</u> ........................................................................ 16

LEGAL FRAMEWORK ...................................................................................................... 17

   A.  **Title III** .............................................................................................................. 17

   B.  **Franks Hearing** ............................................................................................... 19

ARGUMENT ...................................................................................................................... 21

   A.  **Suppression is Warranted Because the Government Failed to Establish Probable Cause that Navarro Committed One of the Offenses Specified in the Warrant Application** .......................................................................................................... 21

   B.  **Suppression is Warranted Because the Applications Contained Material Omissions Made in Reckless Disregard for the Truth** ...................................................... 24

      1.  *The Omissions* ............................................................................................ 25

      2.  *The Omissions Were Made in Reckless Disregard for the Truth* ................ 28

      3.  *The Omissions Were Material* .................................................................... 29

   C.  **Suppression is Warranted Because the Government Failed to Demonstrate the Necessity of the Initial Wiretap** ....................................................................... 30

   D.  **Suppression is Warranted Because the Government Did Not Seek the Wiretap in Good Faith** ........................................................................................................ 32

   E.  **The Court Should Also Suppress the Derivative Fruits of the Wiretap** .................. 35

CONCLUSION .................................................................................................................... 35

I

## Table of Authorities

**Cases**

*Berger v. New York,* 388 U.S. 41, 56 (1967) .............................................................. 17

*Dalia v.United States,* 441 U.S. 249 (1979) ................................................................ 31

*Franks v. Delaware*, 438 U.S. 154 (1978).......................................................... 2, 19, 20

*Gelbard v. United States,* 408 U.S. 41, 46 (1972) ............................................ 17, 18, 19

*Murray v. United States,* 487 U.S. 533 (1988) ........................................................... 35

*Rivera v. United States,* 728 F.Supp. 250 (S.D.N.Y. 1990)....................................... 20, 28

*Rivera v. United States,* 928 F.2d 592 (2d Cir. 1991) .................................................. 20

*United States v. Ailemen,* 986 F.Supp. 1228 (N.D.CA 1997)........................... 28, 29, 31

*United States v. Awadallah,* 349 F.3d 42 (2d Cir. 2003) ......................................... 19, 20

*United States v. Bennett,* 219 F.3d 1117 (9th Cir. 2000) ............................................ 30

*United States v. Binday,* 804 F.3d 558 (2d Cir. 2015)............................................. 21, 34

*United States v. Blackmon,* 273 F.3d 1204 (9th Cir. 2001) ........................................ 31

*United States v. Brodson,* 528 F.2d 214 (7th Cir. 1975) (Justice Clark) ..................... 34

*United States v. Canfield,* 212 F.3d 713 (2d Cir. 2000)............................................... 19

*United States v. Concepcion,* 579 F.3d 214 (2d Cir. 2009) ...................... 24, 25, 30, 34

*United States v. Falso,* 544 F.3d 110 (2d Cir. 2008).................................................. 21

*United States v. Garcia,* 587 F.3d 509 (2d Cir. 2009)................................................ 21

*United States v. Gatto,* 986 F.3d 104 (2d Cir. 2021)................................................. 21

*United States v. Giordano,* 416 U.S. 505 (1974)............................... 18, 19, 24, 25

*United States v. Goffer,* 721 F.3d 113 (2d Cir. 2013)................................................ 33

*United States v. Gonzalez, Inc.* 412 F.3d 1102 (9th Cir. 2005) .................................. 30

*United States v. Leon,* 468 U.S. 897 (1984).............................................................. 21

*United States v. Levine,* 690 F.Supp. 1165 (E.D.N.Y. 1988) ..................................... 33

*United States v. Levy,* 11 Cr. 62 (PAC), 2012 WL 5830631 (S.D.N.Y. 2012)............................ 20

*United States v. Lilla,* 699 F.2d 105 (2d Cir. 1983)............................................... 24, 25

*United States* v. *Marion,* 535 F.2d 697 (2d Cir. 1976) ........................................ 18, 34

*United States v. Masciarelli,* 558 F.2d 1067 (2d Cir. 1977)....................................... 34

*United States v. Messalas,* 17 Cr. 339 (RRM), 2020 WL 1666162 (E.D.N.Y. 2020)................. 33

*United States v. Nejad,* 436 F.Supp.3d 707 (S.D.N.Y. 2020)....................................... 20

*United States v. Raymonda,* 780 F.3d 105 (2d Cir. 2015) ...................................... 21, 22

*United States v. Rajaratnam,* 09 Cr. 1184 (RJH), 2010 WL 4867402 (S.D.N.Y 2010)........ passim

*United States v. Simpson,* 813 F.2d 1462 (9th Cir. 1987).......................................... 29

*United States v. Wagner,* 989 F.2d 69 (2d Cir. 1993)................................................ 22

**Statutes**

18 U.S.C. § 2510 ................................................................................................................... 17

18 U.S.C. § 2515 ............................................................................................................ 19, 24

18 U.S.C. § 2516 ............................................................................................................. 3, 31

18 U.S.C. § 2517(5) ............................................................................................................ 180

18 U.S.C. § 2518 ................................................................................................................... 18

18 U.S.C. § 2518(1)(b) ................................................................................................... 18, 21

18 U.S.C. § 2518(1)(c) ............................................................................................. 18, 25, 29

18 U.S.C. § 2518(d) .............................................................................................................. 25

18 U.S.C. § 2518(1)(e) ......................................................................................................... 18

18 U.S.C. § 2518(1)(f) .......................................................................................................... 18

N.J. Admin. Code § 13:70-14A.18A ...................................................................................... 7

Dr. Erica Garcia respectfully submits this memorandum of law in support of her motion to suppress evidence intercepted over Jorge Navarro's cell phone, and any evidence derived therefrom, because it was obtained in violation of the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. §§ 2150-2522.[1]

## I.

## PRELIMINARY STATEMENT

On January 7, 2019, the government sought authorization to wiretap Jorge Navarro's cell phone. At the time, Navarro was a Thoroughbred trainer with horses stabled in Florida and New Jersey. Dr. Garcia was a Florida-based veterinarian.

The government alleged that Navarro was involved in the distribution and administration of performance-enhancing drugs to racehorses under his care. But the evidence it presented failed to meet the probable cause standard. In its haste to obtain the wiretap, the government neglected to cultivate sources with direct access to Navarro, relying instead on a limited number of marginally relevant conversations he had with a different target subject. As the government itself admitted, none of these conversations established Navarro's treatment practices with respect to the horses he trained.

Further, in its initial application and each of its extension applications—submitted to multiple federal judges in this district—the government repeatedly omitted critical information about its investigation. It told the reviewing courts that traditional investigative tools would be

---

[1] Dr. Garcia has standing as an "aggrieved person" to move for suppression of the Navarro wiretap because she was a party to calls intercepted over his phone. *See* 18 U.S.C. § 2510(11) ("aggrieved person" is "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed"); 18 U.S.C. § 2518(10)(a) ("Any aggrieved person … may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom.").

futile when the FBI had not exhausted such methods, and, indeed, successfully employed them within weeks of securing the initial wiretap. FBI agents obtained a warrant to search Navarro's email account in early February 2019, but the government waited two months to disclose the existence of the warrant to a reviewing court and two more months to report on the progress of its search. Instead, it claimed that the use of search warrants "would not be appropriate at this stage of this investigation." The government also hid its work with two confidential sources, each of whom had direct access to Navarro. Agents first debriefed the sources in mid-January 2019, just twelve days after obtaining the initial wiretap. But the government failed to disclose its work with one source until March and with the second until May. At the same time that the government withheld this information, it downplayed the use of confidential sources generally, stating that the sources it had were "limited in the scope of their respective access" to Navarro.

These omissions were made with a reckless disregard for the truth; in their periodic reports, prosecutors touted the very same investigative accomplishments that agents withheld from their warrant affidavits. The omissions were also material. Had the reviewing courts known about the government's successful use of traditional investigative techniques, they would not have granted—or extended—the wiretap.

Because the initial wiretap application lacked probable cause, and the initial application and extension applications each omitted critical information about the government's investigation, the Court should suppress the wiretap and any evidence derived therefrom. Alternatively, Dr. Garcia has made a "substantial preliminary showing" of recklessness and materiality sufficient to warrant a *Franks* hearing. *Franks v. Delaware*, 438 U.S. 154, 155 (1978).

Finally, the government cannot meet its burden to show that it sought the Navarro wiretap in good faith. Misbranding is not an authorized predicate crime for a Title III intercept under 18 U.S.C. § 2516. Thus, the government claimed to be investigating Navarro's role in a scheme to defraud "racetracks, competitors, and the betting public" chargeable under the mail and wire fraud statutes, and in a related money laundering conspiracy. In violation of Second Circuit precedent, the government failed to disclose its misbranding investigation until submitting its fourth wiretap application. Moreover, nothing in the applications identified a distinct need for the wiretap in connection with a predicate offense, providing another basis for suppression under Title III.

## II.

### STATEMENT OF FACTS

In 2017, the FBI began investigating "various fraudulent schemes" in the professional horseracing industry, specifically those "involv[ing] the provision of controlled and banned substances to race horses" and "misrepresentations to the gaming public, racetracks, and buyers of race horses regarding the 'doping' of those animals." The government submitted its first wiretap application in connection with the investigation on October 23, 2018, seeking authorization to intercept communications over the cell phone of target subject Nick Surick, a racehorse trainer based in New Jersey. Ten weeks later, on January 7, 2019, the government applied for a wiretap of Navarro's cell phone. After the initial order was granted, it sought five 30-day extensions, all of which were also granted.

### A.  The Nick Surick Wiretap Application

The Surick application was supported by the sworn affidavit of FBI Special Agent Bruce A. Turpin. Affidavit of Bruce Turpin (Oct. 23, 2018) ("Turpin Aff. #1"), attached as Exhibit A to

Affirmation of Deborah Colson (July 29, 2021) ("Colson Aff.").[2] Turpin described Surick as a "relatively young trainer … based in New Jersey" who had quickly accumulated thousands of race wins and millions of dollars in purse money. *Id.* at 16-17.

In support of the application's general probable cause allegations, Turpin relied on information provided by three confidential sources: (1) "a former officer of the New Jersey State Police's racetrack unit" and the "Director of Investigation for a privately-owned New Jersey-based racetrack," who the government referred to as "CS-1"; (2) a veterinarian "who previously engaged in administering illicit controlled substances to horses under his care," referred to as "CS-2"; and (3) a "trainer and horse handler," referred to as "CS-3." *Id.* at 14-15.

Turpin represented that Surick had purchased Viagra from CS-3 on various occasions for use on the horses he trained. *Id.* at 17-18. He explained that Viagra is a vasodilator that meets the definition of a prohibited substance under New Jersey and New York's racing rules. *Id.* And he quoted from various text messages CS-3 exchanged with Surick, during which they discussed the "stuff" and the "things," and Surick agreed to give CS-3 money for his "scripts." *Id.* at 21-31. Based on his "experience in th[e] investigation" and "conversations with CS-3," Turpin asserted that the communications "relate[d] almost entirely to the procurement of vasodilator drugs like Viagra and Cialis." *Id.* at 32.

Turpin also recounted an August 5, 2018, meeting between Surick and CS-2 at the Monmouth Park Racetrack in New Jersey. *Id.* at 19. During the meeting, Surick apparently told CS-2 that trainer and target subject Jorge Navarro had been administering Aranesp and Clenbuterol to his horses after they raced, which Turpin stated was prohibited by New York and

---

[2] In compliance with the protective order in this case, exhibits to the Colson Affirmation have been filed under seal.

4

New Jersey rules. *Id.* Turpin added that, when CS-2 encountered Surick, he was speaking with another target subject named Randal Gindi. *Id.*

Then Turpin described a YouTube video depicting Gindi and Navarro at a bar in August 2017, celebrating a race win. *Id.* According to Turpin, Gindi could be heard referring to Navarro as "Juice Man," while Navarro stated, "Is that a Navarro? Is that a Navarro? Is that a Navarro at 2-1? That's the way we do it." *Id.* Gindi replied, "That's the juice. That's the vegetable juice!" *Id.* And Navarro responded, "we fuck everyone." *Id.* Based on his "training and experience," Turpin opined that Navarro and Gindi "were excitedly discussing their racing victory using a horse to which they had administered performance enhancing substances." *Id.* at 20.

In addition to the information provided by the confidential sources, Turpin relied on cellphone toll records obtained pursuant to grand jury subpoenas and court orders. *Id.* at 33. Turpin stated that, between January 12 and October 21, 2018, Surick called and texted Navarro hundreds of times. *Id.* He also noted the number of calls and messages Surick exchanged with other suspects and with racetracks in Philadelphia and New Jersey. *Id.* at 34-38.

Based on the above information, the government sought authority to wiretap Surick's phone for evidence of three target offenses: (1) mail fraud, (2) wire fraud, and (3) conspiracy to commit mail and wire fraud. *Id.* at 5. Each of these crimes is a predicate offense for a Title III intercept under 18 U.S.C. § 2516. Turpin did not include misbranding among the list of target offenses, and it is not a crime for which Congress has authorized the use of wiretaps.

District Judge Colleen McMahon granted the wiretap application on October 23, 2108. The wiretap continued for four months.

**B.  The Jorge Navarro Wiretap Application**

The Navarro wiretap application grew directly out of, and was substantially similar to, the Surick application. Agent Turpin submitted a second affidavit that followed the same format and included much of the same evidence as his first. Affidavit of Bruce Turpin (Jan. 7, 2019) ("Turpin Aff. #2"), attached as Exhibit B to Colson Aff. There were two notable differences. First, Turpin added money laundering to the list of target offenses. *Id.* at 5. Like mail and wire fraud, money laundering is a predicate offense for a Title III intercept. Second, Turpin deleted the text exchanges between Surick and CS-3, which had no bearing on the probable cause analysis for Navarro, and added summary descriptions of calls and text messages between Surick and Navarro intercepted over the Surick wiretap.

Turpin described Navarro as a "top-ranked horse trainer and owner based in Florida" who won "top training honors" for six consecutive years at Monmouth Park and whose horses "set a track record for victories." *Id.* at 17. According to Turpin, between 2008 and 2018, Navarro earned millions of dollars in purse money of which he received a portion as an owner and trainer. *Id.* at 17-18.

1.  *Probable Cause Allegations*

In support of the application's probable cause allegations, Turpin stated that he was relying on information provided by CS-1, CS-2 and CS-3, the same sources who had informed on Surick. *Id.* at 15. Turpin did not offer any new evidence from these sources; he simply repeated his assertions from the Surick application. Turpin described Surick's purchase of Viagra from CS-3. *Id.* at 18-20. He discussed Surick's meeting with CS-2, during which Surick reportedly said that Navarro used Aranesp and Clenbuterol on horses after they raced. *Id.* at 20. And he described the August 2017 YouTube video of Navarro and Gindi celebrating a race win,

6

supposedly involving "a horse to which they had administered performance-enhancing substances." *Id.* at 20-21.

Turpin devoted the balance of his analysis to a description of six conversations between Surick and Navarro intercepted over the Surick wiretap. Three of the conversations concerned a "shock machine" that Navarro borrowed from Surick. According to Turpin, shock machines use "electric shock therapy" to improve a horse's race performance. *Id.* at 22. Turpin asserted that New Jersey law prohibits trainers from possessing shock machines and prohibits their use within 10 days of a race. *Id.* at 22. In fact, the law restricts trainers from possessing shock machines at "location[s] subject to the jurisdiction of the [Racing] Commission." *See* N.J. Admin. Code § 13:70-14A.18A.

During their first exchange about the machine, Surick asked if Navarro planned to "take machine to FL" or wanted Surick "to grab it." Turpin Aff. #2 at 22. During their second, Navarro urged Surick to pay his bills because "things are tight." *Id.* at 25. Then Navarro said: "No no no no money no machine buddy no money no machine that's the best thing you have ever did to me to put that machine in my pocket." *Id.* During their third exchange, Navarro again mentioned returning the machine. *Id.* at 25.

Although Turpin devoted several pages to describing the shock machine messages, he completed neglected to explain their relevance to the probable cause analysis. He failed to present any evidence that Navarro actually used or possessed the machine in violation of New Jersey law. Nor did he link Navarro's possession of the machine to the scheme to defraud under investigation, namely the conspiracy to secretly "distribute, and administer various chemical substances." *Id.* at 5.

During Navarro and Surick's fourth conversation on November 5, Navarro asked Surick whether he "found home for fillys," and Surick responded, "few people asked I come look but there [sic] scared coming from you." *Id.* at 23. Turpin surmised that the men were discussing Surick's attempts to sell Navarro's horses. *Id.* He also speculated that Surick thought potential buyers were hesitant because of Navarro's "reputation for giving his horses performance-enhancing drugs." *Id.* But Turpin did not provide any factual support for his assumption. Indeed, apart from Surick, Turpin failed to reference a single source who knew Navarro personally or claimed to know his reputation.

During their fifth exchange on December 18, Surick asked Navarro to "call me 911." *Id.* at 26. When Navarro called, Surick asked "how long can't they be tested for?" *Id.* at 27. Navarro responded, "After the third day." *Id.* The conversation continued until Surick asked, "so bring 'em back Friday?" and Navarro responded, "Yeah bring them back Friday. Why do you want to fuck with that shit, man?" *Id.*

Based on his investigation, Turpin asserted that Surick probably used a performance-enhancing drug on a horse and was asking Navarro how long the substance would remain in the horse's system. *Id.* at 27-28. Turpin further explained that, around the same time, Surick made arrangements to move a horse from his training center to an unidentified location in Ohio. *Id.* at 28. Turpin believed that Surick transported the horse "in order to conceal" it while it still had drugs in its system. *Id.*

Once again, although Turpin discussed the exchange in detail, he failed to explain its relevance to the probable cause analysis. Even assuming Turpin's representations about Surick's use of a PED were correct, Turpin had no evidence of Navarro's involvement. On the contrary, Navarro told Surick not to "fuck with that shit."

During their sixth and final conversation on December 19, Surick asked Navarro how many "bottles" he wanted and Navarro responded, "Grab me 24. It's got to be 24 bottles. It can't be 25." *Id.* at 29. Despite Navarro's blunt criticism of Surick a day earlier for his apparent use of a PED, Turpin speculated that Surick and Navarro were discussing "selling bottles of a prohibited substance for Navarro to administer to his horses." *Id.* Turpin did not identify the substance or provide any evidence—other than his own best guess—that it was actually prohibited.

The above conversations were the only ones Turpin discussed in the body of his affidavit. In footnotes, however, he also described two calls Surick had with target subject Chris Marino, during which Navarro was mentioned. On the first call, Surick referenced "those trays of red acid" he had bought and "all that stuff I send to Navarro and all that." *Id.* at 23, n. 6. On the second, Surick said that he had "just talked to Navarro" and Navarro had said "I gotta get [U/I]." *Id.* at 28, n.7. Then Surick added, "you know he [Navarro] uses it like fucking water, three days they can't see that horse." *Id.* Turpin could not say what "stuff," if any, Surick sent to Navarro or what substance, if any, Navarro used like water. Indeed, later in the affidavit, when discussing the necessity of the wiretap, Turpin admitted as much, stating that the Surick intercept "*ha[d] not provided information regarding NAVARRO's practices with respect to the Thoroughbred horses he trains*." *Id.* at 42 (emphasis added).

Finally, Turpin described Navarro's cellphone toll records obtained pursuant to grand jury subpoenas and court orders. *Id.* at 30. Turpin stated that, between January 12, 2018, and January 3, 2019, Navarro was in call and electronic contact with Gindi over 200 times and that he also placed multiple calls to the Gulfstream Park racetrack in Florida. *Id.* at 31.

2. *Necessity Allegations*

After discussing probable cause, Turpin addressed the necessity requirement. Earlier in the affidavit, he had described an expansive law enforcement objective: not simply to bring Navarro down, but to identify his co-conspirators, their methods, sources of supply, distribution of funds, and the locations of records, resources and proceeds. *Id* at 5-6. In this section, Turpin argued that no investigative technique other than eavesdropping could meet this objective: "[N]ormal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to achieve the Objectives of the Interception herein sought." *Id.* at 32. Then Turpin proceeded to discuss individual investigative techniques.

Turpin stated that "the use of witness interviews does not appear to be a promising method of investigation" because "witnesses who could provide additional relevant evidence have not been identified or would themselves be participants in the criminal activities." *Id.* at 37-38. He also asserted that subpoenaing potential witnesses to testify in the grand jury "likely would not lead to the discovery of critical information and undoubtedly would alert the Target Subjects to the pendency of this investigation." *Id.* at 37.

In so asserting, Turpin neglected to disclose that the FBI had already interviewed at least one witness, known as "CS Halfback," who knew Navarro personally. The FBI had been introduced to the witness in June 2018 by a private investigative firm named 5 Stones Intelligence. Colson Aff. ¶ 11. CS Halfback told 5 Stones investigators that Navarro used a veterinarian named Bernie Dowd to administer illegal drugs to horses on race day. *Id.* He also advised that Dowd stored Navarro's medications in his truck or office and suggested that agents go to the track the night before a race in order to catch Navarro engaged in misconduct. *Id.*

Turpin debriefed CS Halfback on June 29, 2018. *Id.* at ¶ 12. During the interview, CS Halfback told Turpin that Navarro had offered him a job as a groomer or hot walker and that

Navarro had connections to veterinarians, including Dowd, who doped horses. *Id.* Although Turpin spoke to CS Halfback himself, none of this information appeared in Turpin's affidavit.

In addition to discussing the risks in approaching witnesses, Turpin described the flaws in various other investigative techniques, including the use of confidential sources, search warrants, financial records, and the ongoing intercept of Surick's phone. Turpin asserted that "none of the confidential sources recruited to date obtained direct access to NAVARRO" or "have observed NAVARRO administer … substances prohibited by applicable racing rules, to his horses." Turpin Aff. #2 at 33. He therefore concluded that confidential sources "are unlikely to be in a position to develop information regarding the sources of those additional substances or the means and methods for obtaining and administering such substances." *Id.*

As to search warrants, Turpin stated that they "would not be appropriate at this stage of the investigation, as all the locations where the Target Subjects conduct their activities have not been fully identified." *Id.* at 38. He added: "Nor would those locations, once identified, be likely to contain many traces of the Target Offenses." *Id.*

Turpin represented that he had obtained bank records "associated with NAVARRO" but suggested he had not yet reviewed them. *Id.* at 37. He also claimed that the records were of limited utility because they were unlikely to reveal whether and when Navarro had administered a banned substance. *Id.*

Finally, Turpin concluded that the Surick intercept had proved useful "in uncovering the scope of SURICK's fraudulent activities" and his provision of a shock machine and "prohibited

11

substances" to Navarro. *Id.* at 41-42. But he said the intercept "ha[d] not provided information regarding NAVARRO's practices with respect to the Thoroughbred horses he trains." *Id.* at 42.[3]

Based on the above representations, the government requested permission to tap Navarro's cell phone for a period of 30 days. Judge Berman granted the government's initial application on January 7, 2019.

3. *Extension Applications*

a. <u>February Application</u>

On February 6, 2019, the government filed a second application with District Judge Edgardo Ramos seeking permission to extend its wiretap for 30 days. The February application was supported by the affidavit of FBI Special Agent Timothy Bergen. Affidavit of Timothy Bergen (Feb. 6, 2019) ("Bergen Aff. #1"), attached as Exhibit C to Colson Aff. Bergen's affidavit was similar to Turpin's, except that it added descriptions of conversations intercepted during the prior 30-day period in support of the probable cause allegations.

Bergen repeated Turpin's necessity allegations with little alteration, conspicuously omitting to mention the FBI's recent progress with more traditional investigative techniques. On February 5, 2019, one day before Bergen submitted his affidavit, the government obtained a warrant to search Navarro's email account—a significant investigative accomplishment. Colson Aff. ¶ 13. But Bergen made no mention of the email warrant in his affidavit. Instead, he

---

[3] Turpin also criticized several other techniques. He stated that: (1) physical surveillance was insufficient because surveilling agents were not able to observe what was happening inside the stables, *id.* at 34; (2) toll records were insufficient because they did not reveal the substance of telephone conversations, *id.* at 36; (3) pole cameras placed on the exterior of pertinent locations did not show what was happening inside, *id.* at 35; (4) geolocation information would not reveal the "means and methods" of the scheme, *id.*; and (5) trash searches were futile because the target subjects were unlikely to put "incriminating refuse … on the streets," *id.* at 40.

continued to insist that "[t]he use of search warrants, generally, would not be appropriate at this stage of the investigation." Bergen Aff. #1 at 62.

Bergen also neglected to inform the court that the FBI had begun working with two new confidential sources ("CS-5" and "CS-6"), each of whom knew Navarro personally. The FBI met CS-5 and CS-6 through 5 Stones, the same investigative firm that recruited CS Halfback. Colson Aff. ¶ 14. Its first debriefing with the sources occurred on January 15, 2019, three weeks *before* the government filed its extension application. *Id*. Yet Bergen failed to mention the sources anywhere in his affidavit. And if that failure was not enough, he also continued to suggest that CS-1, CS-2 and CS-3 were the government's *only* sources and that they were "limited in the scope of their respective access to the Target Subjects' commission of the Target Offenses." Bergen Aff. #1 at 57.

Notably, around this same time, prosecutors explicitly referenced CS-5 and CS-6 in a letter submitted under seal to a different judge. In its first periodic report about the Navarro wiretap, addressed to Judge Gardephe on January 18, 2019, the government explained that "[i]nvestigators have met with and are in the process of signing up, *two confidential sources* who … are also familiar with NAVARRO and have agreed to provide proactive assistance to law enforcement with respective to NAVARRO's activities." *See, e.g.,* First Periodic Report (Jan. 18, 2019) at 11, attached as Exhibit D to Colson Aff. (emphasis added). In other words, Bergen withheld from Judge Ramos the *very same information* that prosecutors deemed sufficiently important to disclose to Judge Gardephe.

Bergen also omitted to mention whether Navarro's bank records had been reviewed, or to explain the basis—if any—for the delay. Bergen Aff. #1 at 64-65 (mentioning only that agents had subpoenaed Navarro's InCompass records, which tracked purse wins). Moreover, while

prosecutors touted the value of financial records in their periodic report, *see* Ex. D at 9 (Surick's bank records could lead to co-conspirators "by tracing the transfer of winnings from" from Surick to others), Bergen continued to claim they were of limited utility because they were "unlikely to reveal" when Navarro used a banned substance or which substance he used. Bergen Aff. #1 at 61.

b.   March Application

On March 7, 2019, the government filed a third application with District Deborah Batts seeking permission to extend its wiretap another 30 days. The March application was supported by a second affidavit from Bergen. *See* Affidavit of Timothy Bergen (March 7, 2019) ("Bergen Aff. #2), attached as Exhibit E to Colson Aff. Bergen's second affidavit was similar to his first, except that he again added descriptions of conversations intercepted during the prior 30 days in support of probable cause.

For the second time, Bergen failed to disclose the government's warrant to search Navarro's email account. Nor did he update the Court on the progress of the government's email review. Instead, he again stated that search warrants "would not be appropriate at this stage." *Id.* at 69.

Bergen also continued to withhold key information about the FBI's work with the confidential sources. He finally referenced CS-5,[4] explaining that Navarro had invited CS-5 to Dubai in March 2019 for the Dubai World Cup and that, during the trip, the government expected CS-5 "to be in a position to observe firsthand the substances NAVARRO intended to administer" to his horse. *Id.* at 64. Yet Bergen also downplayed the significance of the FBI's progress with CS-5, stating that the source was "not expected to provide direct information

---

[4] Bergen actually referred to the source as "CS-4." In all subsequent applications, however, the same source was identified as "CS-5."

regarding NAVARRO's source of supply or network of distribution of prohibited substances."
*Id.*

Even more importantly, Bergen completely neglected to mention CS-6. CS-5 and CS-6 had both participated in a consensually recorded meeting with Navarro in mid-February *at the FBI's request*. Colson Aff. ¶ 15. Moreover, prosecutors explicitly referenced both sources in their February 19 and February 26 periodic reports submitted under seal to Judge Paul Engelmayer. *See, e.g.,* First Periodic Report (Feb. 19, 2019) at 11 ("Investigators are still in the process of signing up two confidential sources who … are familiar with NAVARRO."), attached as Exhibit F to Colson Aff. Yet Bergen made no reference to CS-6 in anywhere in the affidavit submitted to Judge Batts.

c.   <u>April and Early May Applications</u>

The government obtained additional extensions of the wiretap on April 5 and May 3, 2019, before Judges George Daniels and Loretta Preska respectively. Each of these applications was supported by an affidavit from Bergen that repeated the allegations from the prior month's affidavit, with additional descriptions of communications intercepted during the previous 30 days. *See* Affidavits of Timothy Bergen (April 5, 2019 and May 3, 2019) ("Bergen Affs. #3 & #4"), attached as Exhibits G, H to Colson Aff. The May 3 affidavit was unique in that Bergen finally revealed the true focus of the investigation by adding the crime of misbranding to the list of target offenses. Bergen Aff. #4 at 7. In a footnote, he also acknowledged that misbranding is not a predicate offense for a Title III wire intercept. *Id.* at 7, n. 9.

Nearly two months after obtaining a warrant to search Navarro's email account, Bergen finally noted the existence of the warrant in a footnote to the April affidavit. Bergen Aff. #3 at 73, n. 36. But he did not report on the progress of the government's search. Nor did he mention the government's work with CS-6 in either affidavit, even though prosecutors again referenced

CS-6 in their March 27 periodic report, submitted under seal to Judge Alvin Hellerstein. *See, e.g.,* Periodic Report (March 27, 2019), at 8 ("Investigators have signed up two confidential sources who … are familiar with Navarro"), attached as Exhibit I to Colson Aff.

    d.  <u>Late May Application</u>

       The government's final application was submitted to District Judge Alison Nathan on May 29, 2019, and supported by another affidavit from Bergen. Affidavit of Special Agent Timothy Bergen (May 29, 2019) ("Bergen Aff. #5"), attached as Exhibit J to Colson Aff. Bergen's late May affidavit built on the foundation established by the prior affidavits, but it also differed in significant respects from the earlier versions.

       First, it included a second target cellphone, belonging to trainer and target subject Jason Servis. Second, three months after obtaining the warrant to search Navarro's email account, Bergen finally reported on the progress of the government's search. *Id.* at 116-117. In a footnote, Bergen acknowledged that the search had "provided valuable information," including the names of veterinarians "who supplied NAVARRO with performance-enhancing substances," "instructions provided to administer performance-enhancing substances," and "the billing and invoicing practices of those veterinarians." *Id.* at 117, n. 55. At the same time, however, he downplayed the warrant's utility in the body of the affidavit, claiming that Navarro and others may have "falsified … invoices for veterinary services or products, which are distributed over email," so their communications "may not provide reliable information regarding the state of mind of certain Target Subjects engaged in these practices." *Id.* at 117.

       Third, more than four months after the initial debriefing, Bergen finally admitted that the FBI had been working with *two* confidential sources (CS-5 and CS-6), each of whom had direct access to Navarro. *Id.* at 108 and n. 47. He went on to explain that the second source (CS-6) had accompanied the first (CS-5) to meetings with Navarro and had provided information regarding

Navarro's activities. *Id.* In the body of the affidavit, Bergen continued to assert that CS-5 and CS-6 would not be able to provide information about Navarro's sources of supply or distribution network. *Id.* at 108. But he contradicted himself in a footnote, stating that both sources were likely to undercover that exact information. *Id.* at 109, n. 47 (confidential sources would uncover Navarro's "source of supply" and "network of distribution of prohibited performance-enhancing substances."). In other words, Bergen admitted in the footnote that CS-5 and CS-6 would obtain the very information he had long claimed they could not.

Judge Nathan granted the application on May 29, and the government's wiretap continued for another 30 days.

### III.

### LEGAL FRAMEWORK

#### A. Title III

Unlike any other type of search, a wiretap allows the government secretly into the home, office, car and most intimate conversations of the target subject and scores of other individuals against whom the government has no reasonable suspicion. For that reason, that Supreme Court places a "heavier responsibility" on courts to supervise the "fairness of procedures" for obtaining such a warrant. *Berger v. New York,* 388 U.S. 41, 56 (1967). The judge authorizing the wiretap must independently determine that probable cause exists and that "no greater invasion of privacy was permitted than was necessary under the circumstances." *Id.* at 57.

Congress enacted Title III to establish a "comprehensive scheme for the regulation of wiretapping and electronic surveillance." *Gelbard v. United States,* 408 U.S. 41, 46 (1972). The statute strictly "limit[s]" the use of wiretaps "to certain major types of offenses and specific categories of crime" that Congress determined necessitate covert surveillance. 18 U.S.C. § 2510

note (congressional findings); *see Gelbard,* 408 U.S. at 46 (use of wiretaps confined to investigating "specified serious crimes").

Under the terms of § 2517(5), the government can only use wiretap evidence of crimes "other than those specified" in the authorization order or in § 2516 by obtaining judicial approval "as soon as practicable." In so doing, the government must show that "'the original order was lawfully obtained, that it was sought in good faith and not as a subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order.'" *United States v. Rajaratnam,* 09 Cr. 1184 (RJH), 2010 WL 4867402, at *3 (S.D.N.Y. Nov. 24, 2010) (quoting *United States* v. *Marion,* 535 F.2d 697, 700 (2d Cir. 1976)).

Even as to those crimes for which Congress authorized the use of wiretaps, Title III imposes "important preconditions to obtaining any intercept authority at all." *United States v. Giordano,* 416 U.S. 505, 515 (1974). The warrant must be predicated on a finding of probable cause to believe that (i) the individual has committed or is about to commit one of the offenses specified in § 2516, (ii) communications concerning that offense will be intercepted, and (iii) the particular telephone being tapped is being used in the connection with the offense. 18 U.S.C. § 2518(3). Title III mandates that law enforcement provide the authorizing court with a "full and complete statement of the facts and circumstances relied upon by the applicant" to establish probable cause, 18 U.S.C. § 2518(1)(b), and a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(1)(c).

Applications for extensions of a wiretap order must reveal previous applications and orders, and must contain "a statement setting forth the results thus far obtained from the interception." 18 U.S.C. §§ 2518(1)(e) & (1)(f). The reviewing court is "required to make the

same findings that are required in connection with the original order," including "that there is probable cause in the traditional sense and that normal investigative procedures are unlikely to succeed." *Giordano,* 416 U.S. at 530.

Title III prohibits the wiretapping of conversations except in conformity with the statute's "stringent conditions," *Gelbard,* 408 U.S. at 46, and excludes wiretapped conversations from use "in any trial, hearing, or other proceeding" if the "disclosure of that information would be in violation of this chapter," 18 U.S.C. § 2515. Title III's statutory rule of exclusion is distinct from and supplements the Fourth Amendment's own rule, and "require[s] suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *Giordano,* 416 U.S. at 527.

### B. Franks Hearing

A defendant may, "[i]n certain circumstances … challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure." *United States v. Awadallah,* 349 F.3d 42, 64 (2d Cir. 2003) (citing *Franks*, 438 U.S. at 164-72. To obtain a *Franks* hearing, a defendant must make a "substantial preliminary showing" that (1) the warrant affidavit included misrepresentations or omissions that were made with a knowing or reckless disregard for the truth; and (2) those misrepresentations or omissions were material, meaning "necessary to the [issuing] judge's probable cause [or necessity] finding." *United States v. Rajaratnam,* 719 F.3d 139, 146-147 (2d Cir. 2013) (alterations in original) (quoting *United States v. Canfield,* 212 F.3d 713, 717-18 (2d Cir. 2000)). To satisfy this test, "a defendant must 'point out specifically the portion of the warrant affidavit

19

that is claimed to be false.'" *United States v. Levy,* 11 Cr. 62 (PAC), 2012 WL 5830631, at *5 (S.D.N.Y. Nov. 16, 2012)) (quoting *Franks,* 438 U.S. at 171).

"The reviewing court must be presented with credibly and probative evidence" that a misstatement or omission "was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *Rajaratnam,* 719 F.3d at 154 (alteration in original) (quoting *Awadallah,* 349 F.3d at 68). Reckless disregard for the truth may be established by demonstrating that an affiant made "statements which failed to take account of the facts as he knew them, or which he seriously doubted were true." *Rivera v. United States,* 728 F.Supp. 250, 258 (S.D.N.Y. 1990), *aff'd in relevant part, Rivera v. United States,* 928 F.2d 592 (2d Cir. 1991). Where omissions are concerned, courts may also consider "whether the omitted information was 'clearly critical' to the probable cause [or necessity] determination." *Rivera,* 928 F2d at 604.

"[C]ourts 'gauge materiality by a process of subtraction' or addition depending on whether misstatements or omissions are at issue." *United States v. Nejad,* 436 F.Supp.3d 707, 719 (S.D.N.Y. 2020) (quoting *Awadallah,* 349 F.3d at 65). "In other words, to determine materiality, courts should 'disregard the allegedly false statements,' 'insert the omitted truths,' and determine whether 'there remains a residue of independent and lawful information sufficient to support probable cause.'" *Id.* (citations omitted).

## IV.

## ARGUMENT

**A. Suppression is Warranted Because the Government Failed to Establish Probable Cause that Navarro Committed One of the Offenses Specified in the Warrant Application**

In seeking to wiretap Navarro's cell phone, the government bore the burden of showing, through a "full and complete statement" of the relevant facts and circumstances, probable cause that evidence of wire fraud, mail fraud or money laundering would be found in his phone conversations. 18 U.S.C. § 2518(1)(b). Wire and mail fraud both include as elements a "scheme to defraud" with use of wires or mail to further the scheme. *See United States v. Gatto,* 986 F.3d 104, 113 (2d Cir. 2021) (quoting *United States v. Binday,* 804 F.3d 558, 569 (2d Cir. 2015)) (elements of wire fraud include: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the … wires to further the scheme."). Money laundering requires concealment of "the nature, the location, the source, the ownership, or the control of the proceeds of [a] specified unlawful activity." *United States v. Garcia,* 587 F.3d 509, 516 (2d Cir. 2009).

In assessing probable cause, "a judge must make a practical common-sense decision whether, given all the circumstances set forth in the affidavit before h[er] … there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Raymonda,* 780 F.3d 105, 113 (2d Cir. 2015) (internal quotation marks) (quoting *United States v. Falso,* 544 F.3d 110, 117 (2d Cir. 2008)). Courts "'may properly conclude that … [a] warrant was invalid because the [district court's] probable-cause determination reflected an improper analysis of the totality of circumstances." *Falso,* 544 F.3d at 117 (alterations in original) (quoting *United States v. Leon,* 468 U.S. 897, 915 (1984)).

The government's January 2019 application fell far short of the probable cause standard. First, in its haste to obtain the wiretap, the government neglected to cultivate sources with direct access to Navarro, relying instead on sources (CS-1, CS-2, and CS-3) who had been recruited months earlier to investigate Nick Surick. Of the three, only CS-2 had any information at all about Navarro, and even his information was second-hand. CS-2 reported having heard from Surick that Navarro used Aranesp and Clenbuterol on horses after they raced. But Turpin had no evidence to corroborate the truth of Surick's statement. Nor is Clenbuterol even a banned substance. It is a controlled therapeutic; its use is permitted in New Jersey and New York so long as a horses does not race with the drug present in its system above a certain threshold.[5]

Second, even assuming the YouTube video provided actual evidence of Navarro's activities, the video was eighteen months old and thus too stale to establish probable cause "*as of the time of the search*." *Raymonda,* 780 F.3d at 114 (emphasis in original) (quoting *United States v. Wagner,* 989 F.2d 69, 75 (2d Cir. 1993) (defendant's access of pornographic website nine months earlier did not establish probable cause that he still possessed child pornography at the time of the search). Moreover, Turpin's analysis of the video was wholly inaccurate. Navarro and Gindi were not celebrating a horse "to which they had administered performance enhancing substances." As was reported in the press, Navarro did not have a horse in the race he and Gindi were watching. In fact, they were cheering a horse trained by Navarro's brother, Marcial. Frank

---

[5] *See, e.g.*, N.J.A.C. 13:70-14A.1(b)(14)) (incorporating by reference ARCI Controlled Therapeutic Medication Schedule, version 2.1 (Revised April 17, 2014)); ARCI Schedule, *available at*: https://www.racingcommission.nd.gov/sites/www/files/documents/horsemen/ARCI%20Therapeutic%20Medication%20Rules%20version%204.2.pdf (Clenbuterol is a controlled therapeutic with a 14-day withdrawal); 9 NYCRR § 4043.3(a)(5) (horses cannot race with Clenbuterol present in their system above a certain threshold); 9 NYCRR § 4043.2(i)(3) (horses may not race for at least 14 days following administration of Clenbuterol).

Angst, *Monmouth Stewards Urge Large Fines for Gindi, Navarro*, BloodHorse.Com (Sept. 11, 2017). Given the widespread coverage of this incident, Turpin knew or should have known that his description of the video was wrong.

The strength of Turpin's affidavit rested on the evidentiary value of Navarro's conversations with Surick. Yet these conversations had more to do with Surick than Navarro. Surick confided in Navarro about his own use of illegal drugs, but Navarro failed to respond in kind, instead telling Surick not to "fuck with that shit."

Navarro did mention having a shock machine. But Turpin had no evidence that Navarro used or possessed the machine in violation of the law. Further, his possession of the machine had no bearing on his involvement in the scheme to defraud under investigation, namely the conspiracy to "distribute and administer various chemical substances." Turpin's repeated references to the machine were a red herring meant to distract the reviewing court from the lack of relevant evidence.

In ten weeks of intercepting Surick's calls, Turpin uncovered just one conversation during which Navarro referenced his own practices,[6] and even that call was too vague to have any real evidentiary significance. Navarro asked Surick for "bottles" of a drug, and they discussed the number of bottles Navarro intended to purchase. But Turpin was unable to establish what drug Navarro bought, whether it was performance enhancing, or whether Navarro intended to administer the substance in violation of race rules. Toward the end of the affidavit,

---

[6] On a call with Marino, Surick said that he sent "red acid" and other "stuff" to Navarro. But Turpin was unable to corroborate Surick's assertion. Navarro, himself, never mentioned red acid during his conversations with Surick. Moreover, at the time Turpin drafted the affidavit, the government lacked the scientific evidence to establish that red acid was performance enhancing. It had not performed laboratory tests on the drug to determine whether it contained banned substances, nor had it retained an expert to opine on the drug's performance-enhancing effects. Colson Aff. ¶ 18. Notably, the government still lacks such evidence. *Id.*

when claiming the necessity of the wiretap, Turpin acknowledged that the Surick intercept had failed to uncover Navarro's "*practices with respect to thoroughbred horses he trains*." Turpin Aff. #2 at 42 (emphasis added). This was a stunning admission coming from the same agent who was relying on the intercept to establish probable cause.

In short, absent sufficient evidence to establish that Navarro used performance-enhancing drugs on the horses he trained, the government failed to establish a "fair probability" of his involvement in a scheme to defraud required under the wire and mail fraud statutes. Nor did the government present any evidence at all that Navarro was attempting to conceal the proceeds of his alleged illegal activities in connection with a potential money laundering charge. Accordingly, any wiretap interceptions obtained pursuant to the government's January 2019 wiretap application must be suppressed. Consistent with 18 U.S.C. § 2515, wiretap interceptions obtained pursuant to the extension orders should also be suppressed as fruit of the poisonous tree. 18 U.S.C. § 2515 (Whenever any wire or oral communication has been intercepted … no evidence derived therefrom may be received in evidence); *see also Giordano,* 416 U.S. at 529-30 (where court suppressed initial wiretap order, suppression of extension order also required as "evidence derived" from communications intercepted under the original order).

**B. Suppression is Warranted Because the Applications Contained Material Omissions Made in Reckless Disregard for the Truth**

Undoubtedly, it would be "'more efficient to wiretap whenever a telephone was used to facilitate the commission of a crime.'" *United States v. Concepcion,* 579 F.3d 214, 218 (2d Cir. 2009) (quoting *Lilla,* 699 F.2d at 105 n. 7). But Congress determined that the "'cost of such efficiency in terms of privacy interests is too high,'" *id.*, and confined the used of wiretaps to an enumerated list of "serious crimes," *Gelbard,* 408 U.S. at 46. Even for those specified crimes,

wiretaps may only be used when truly "necessary to assist in law enforcement." *Concepcion,* 579 F.3d at 218 (internal quotation omitted).

To enforce these important limitations, Title III requires that the government provide a full and complete statement addressing the "nature and progress of the investigation," *id.*, including "whether or not other investigative procedures have been tried" or "why they reasonably appear unlikely to succeed if tried," 18 U.S.C. § 2518(d). "[G]eneralized and conclusory statements that other investigative procedures would prove unsuccessful" are insufficient. *Concepcion,* 579 F.3d at 218 (quoting *Lilla*, 699 F.2d at 104). Applications for extensions of a wiretap order must meet the same requirements. *Giordano,* 416 U.S. at 530.

The government did the exact opposite of what is required here, forsaking its obligation of candor in favor of selective disclosures and the wholesale omission of critical, statutorily required information. As a result, the reviewing courts were misled into finding that the Title III requirements were satisfied.

1. *The Omissions*

In his initial affidavit, submitted in January, Turpin told the court that witness interviews were not "a promising method of investigation" because witnesses "would undoubtedly alert the Target Subjects to the pendency of this investigation." Turpin Aff. #2 at 37. Yet six months earlier, Turpin had interviewed at least one witness, CS Halfback, who knew Navarro personally. Apparently, the government opted not to work with CS Halfback on an ongoing basis. But that is beside the point. The government has no right to conceal the investigative leads it chooses not to pursue. Quite the opposite, under § 2518(1)(c), it is required to provide a "full and complete statement" of "other investigative procedures," including those that "have been tried and failed." In addition, there is no evidence that Turpin's interview with CS Halfback did anything to impair

the government's investigation, which had continued unabated for nearly two years. If CS Halfback—or any other witnesses with whom the government spoke—had the effect of hindering the investigation, surely the government would have mentioned it.

The interview of CS Halfback was not the only aspect of its investigation that the government omitted from its applications. The government repeatedly asserted that the use of search warrants "would not be appropriate at this stage of the investigation." Yet it secured a warrant to search Navarro's email account on February 5 and later acknowledged that its search of the account had uncovered valuable information, including the names of veterinarians who supplied Navarro with performance enhancing drugs. The government failed to disclose the existence of the email warrant until April, two months after it began intercepting Navarro's calls. And even in its final application submitted in late May, the government concealed the true promise of the warrant, insisting that falsified invoices found in the account "may not provide reliable information" regarding the target subjects' "state of mind." Bergen Aff. #5 at 117. Even on its face, Bergen's representation was disingenuous. As an experienced investigator, he well knew that falsified invoices could evidence a scheme to defraud. Indeed, when the government superseded the indictment in November 2020, charging some defendants with wire fraud, it did so under this very theory—that the defendants defrauded their client horse-owners by creating fraudulent veterinary bills and falsely billing owners for their undisclosed use of PEDs. S-6 Ind. ¶ 55.

Finally, the government withheld critical information about its use of confidential informants. In its initial affidavit, the government insisted that confidential sources would have limited access to the target subjects. That was untrue. The government knew that its use of confidential sources had already borne fruit with its investigation of Nick Surick. CS-3 sold

Viagra to Surick on multiple occasions, and Surick told CS-3 that he used the Viagra on his horses, thus revealing both the means and method for obtaining and administering a prohibited substance. The government failed to offer a credible explanation why it could not recruit sources to accomplish the same goals in relation to Navarro.

Moreover, just twelve days after obtaining the initial wiretap, the government *did* meet with two confidential sources who had direct access to Navarro and began the formal recruitment process. However, it neglected to provide a full and complete statement regarding its work with the sources, instead releasing information about them in bits and pieces so as to diminish their importance. The FBI first debriefed CS-5 and CS-6 on January 15, 2019. In February, the government sent both sources to meet with Navarro. Subsequently, CS-5 traveled to Dubai where he met with Navarro at Navarro's invitation. Yet the government hid its work with CS-5 until March and omitted to mention CS-6 until May.

Even when the government finally revealed its work with the sources, it intentionally misled the court by minimizing their significance. CS-5 had gained Navarro's confidence remarkably quickly, earning an invitation to visit with him in Dubai. But the government claimed that direct access to Navarro was insufficient, even if CS-5 might expose Navarro's commission of a crime. Rather, the government needed someone capable of developing information regarding sources of supply and "the full means and methods for obtaining and administering" the drugs. Bergen Aff. #2 at 64.

In its final application, submitted in late May, the government finally laid its cards on the table. It admitted to working with CS-6 and further acknowledged in a footnote that CS-5 and CS-6 were expected to provide information about Navarro's "source of supply or network of distribution." Bergen Aff. #5 at 109, n. 47. In other words, Bergen revealed that both sources

were likely to accomplish the very same law enforcement objectives he had previously said they could not. But the government's admission was too little too late. By this point, it had already been intercepting Navarro's calls for close to five months.

2.   *The Omissions Were Made in Reckless Disregard for the Truth*

Having participated in the investigation for months—and possibly since its inception—Turpin and Bergen's omissions could not have been the result of negligence. Rather, they "failed to take into account the facts as [they] knew them" at the time. *Rivera,* 728 F. Supp. at 258.

Turpin interviewed CS Halfback himself, yet neglected to acknowledge the interview in his initial affidavit, instead misleading the court to believe that interviewing or subpoenaing witnesses might alert suspects to the investigation. Similarly, Bergen failed to disclose the email warrant in his February affidavit, even though the government had secured the warrant the day before. Instead, he had the nerve to state that "search warrants, generally, would not be appropriate at this stage." Bergen also neglected to mention CS-5 and CS-6, even though the FBI's first debriefing with the sources occurred on January 18, three weeks before he drafted the affidavit. Again he misled the court, stating that the sources he had were "limited in the scope of their respective access" to the target subjects.

Worse still, Bergen failed to correct these misrepresentations in subsequent affidavits and in fact perpetuated them. He omitted any mention of the email warrant again in his March affidavit. He also failed to mention CS-6 in his March, April and early May affidavits, even though CS-6's February meeting with Navarro was consensually recorded at the FBI's behest, and prosecutors continued to reference both sources in their periodic reports submitted under seal to different judges. *See United States v. Ailemen,* 986 F.Supp. 1228, 1238 (N.D.CA 1997)

28

(finding it reckless for the government not to reveal a second confidential source who was valuable to its investigation).

It strains credulity to believe that the agents simply forgot about these aspects of their investigation or believed they were not relevant to the reviewing courts' necessity analyses. At best, the omissions were made with a reckless disregard for the truth.

3. *The Omissions Were Material*

These omissions were clearly material to the reviewing courts' necessity analyses. Had Judge Berman understood that basic investigative techniques would *not* have been futile—and indeed succeeded just weeks after the first application was sought—he would have held that the application lacked a "full and complete statement" regarding the investigative procedures that were "tried and failed" or "unlikely to succeed." 18 U.S.C. § 2518(1)(c). The same is true for the extension applications. Had the authorizing courts known that the government: (1) interviewed CS-Halfback without jeopardizing the investigation; (2) obtained a warrant to search Navarro's email account, uncovering valuable information in the process; and (3) recruited two confidential sources who met with Navarro personally, they would have determined that traditional investigative tools had *not* been exhausted and, moreover, that these techniques were succeeding when tried. *See, e.g., United States v. Simpson,* 813 F.2d 1462, 1471-73 (9th Cir. 1987) (application misrepresented utility of confidential informant and omitted investigator's successful interactions with the target); *Ailemen,* 986 F.Supp. at 1234-42 (application exaggerated the target's "organization," omitted names of known participants, misrepresented the usefulness of undercover agents, concealed unpursued leads, and failed to disclosed the existence of a related investigation). Accordingly, they would not have granted the extensions.

The Court should suppress the wiretap or hold a *Franks* hearing to determine the extent to which the issuing courts relied on the government's omissions. *United States v. Rajaratnam,* 09 Cr. 1184 (RJH), 2010 WL 3219333, at *2 (S.D.N.Y. Aug. 12, 2010) (finding that the defense made a "substantial preliminary showing" that the government recklessly or knowingly omitted "several key facts" relating to necessity and ordering a *Franks* hearing).

### C. Suppression is Warranted Because the Government Failed to Demonstrate the Necessity of the Initial Wiretap

Even assuming the Court finds that the government's omissions were not material—and they were—it should still suppress the wiretap because the government failed to demonstrate the necessity of the initial application. The government has a "responsibility to use promising traditional techniques." *United States v. Gonzalez, Inc.* 412 F.3d 1102, 1113 (9th Cir. 2005). While it "need not exhaust every conceivable investigative technique," it must as least demonstrate that "ordinary investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time." *United States v. Bennett,* 219 F.3d 1117, 1122 (9th Cir. 2000) (citations omitted).

The government first sought to wiretap Navarro's phone in January 2019, just ten weeks after it began intercepting his conversations with Surick. Before seeking the wiretap, FBI agents made little, if any, effort to investigate Navarro using traditional investigative techniques. They neglected to recruit sources who knew him personally, even though the use of sources had succeeded with Surick. They made no attempt to conduct surveillance. They did not seek search warrants. And while they claimed to have obtained certain bank records, they sought the wiretap *before* those records had been reviewed.

Rather than attempt even the most basic investigative procedures, Turpin dismissed those techniques with a catalogue of boilerplate assertions about their inherent limitations. Witnesses

__

might alert the target subjects to the investigation. Turpin Aff. #2 at 37. Physical surveillance would not show what was taking place behind closed doors. *Id.* at 34. And toll records would not include the substance of conversations. *Id.* at 36. The Second Circuit has clearly stated that these sorts of "generalized and conclusory statements" are insufficient. *Concepcion,* 579 F.3d at 218.

At the same time that he criticized traditional techniques, Turpin also described an expansive FBI investigation. The FBI's goal was not just to catch Navarro, but to identify his co-conspirators, their methods, sources of supply, distribution of funds, etc. This tactic of claiming a seemingly unlimited law enforcement goal pervaded Turpin's application. *See, e.g.,* Turpin Aff. #2 at 33 (confidential sources unlikely to develop information regarding sources or means and methods of obtaining and administering drugs); *id.* at 34 (physical surveillance does not permit agents "to determine the full membership of criminal conspiracies"); *id.* at 36 (grand jury process unlikely to "develop evidence concerning the internal operations of the racing business"). Other courts have already noted the government's use of this strategy and warned that it "cannot be taken too far." *Ailemen,* 986 F.Supp. at 1235 (government's claim that "wiretap was necessary to iron out all of the details of the conspiracy…cannot be taken too far."). The government cannot "cast its investigative net so far and so wide as to manufacture necessity in all circumstances." *United States v. Blackmon,* 273 F.3d 1204, 1211 (9th Cir. 2001). "Doing so would render the requirements of § 2518 nullities." *Id.*

Absent any real effort to investigate Navarro prior to seeking the wiretap, or to provide specific and satisfactory reasons why it could not employ the most basic law enforcement techniques, the government failed to satisfy the necessity requirement.

**D. Suppression is Warranted Because the Government Did Not Seek the Wiretap in Good Faith**

Suppression is also warranted because the government did not seek the wiretap in good faith in order to investigate an eligible, predicate offense.

In § 2516 of Title III, Congress "set forth with meticulous care" the crimes that might warrant the use of a wiretap. *Dalia,* 441 U.S. at 249. Each offense was "chosen either because it is intrinsically serious or because it is characteristic of the operations of organized crime." *Id.* at 252 n.13. Misbranding is not included among § 2516's list of eligible offenses, thus reflecting a categorical judgment that wiretaps are not necessary or appropriate tools for investigating a misbranding crime.

Title III permits the use of wiretaps to prosecute non-wiretap-eligible offenses only when (i) the wiretap order was "sought in good faith and not as a subterfuge search," and (2) law enforcement comes upon evidence of the ineligible offense "incidentally" in the course of intercepting communications for an authorized offense. *Rajaratnam,* 2010 WL 4867402, at *3. For this reason, when an application reveals that an ineligible offense is the principle target of an investigation, vigilant enforcement of the necessity prong is critical. In those circumstances, courts must ensure that the wiretap is necessary to some aspect of the investigation concerning the eligible crime.

Here, nothing in the applications identified a distinct need for the wiretap in connection with the government's investigation of the eligible offenses. Instead, the necessity allegations were directly linked to the challenges of conducting a misbranding investigation. Turpin asserted, for example, that confidential sources were of limited utility because none "have observed NAVARRO *administer ... substances* prohibited by applicable racing rules"; therefore the sources "are unlikely to be in a position to develop information regarding the *sources of those*

*additional substances or the means and methods for obtaining and administering such substances*." Turpin Aff. #2 at 32-3 (emphasis added). The government's alleged concerns about physical surveillance and grand jury subpoenas were explained in similar fashion. Turpin stated that "the *administration of prohibited substances* most likely takes place in stables controlled by the Target Subjects, which are necessarily difficult areas to physically surveil…." *Id.* at 34 (emphasis added). He added that subpoenaing records "is unlikely to reveal either that *NAVARRO administered a banned substance* on a particular occasion or *which banned substance* he may have administered." *Id* at 37 (emphasis added). As to each of those arguments, Title III has already made the categorical determination that wiretaps are not necessary.

In *United States v. Goffer,* the defense argued that the trial court erred in permitting the government to use evidence obtained through wiretaps in a securities fraud prosecution because securities fraud is not a predicate offense under Title III. *United States v. Goffer,* 721 F.3d 113, 122 (2d Cir. 2013). The Second Circuit disagreed. It stated that the law permits use of evidence of other offenses where the government "forthrightly discloses the probability of intercepting 'communications relating to other offenses' *ex ante,* at the time it makes its initial wiretap application." *Id.* at 123. Thus, when "Government investigators indicated in the wiretap application that, in addition to wire fraud, they expected to uncover evidence of securities fraud (which, they expressly noted, is 'not a predicate offense under 18 U.S.C. § 2516')," admission of such evidence was lawful. *Id. See also United States v. Messalas,* 17 Cr. 339 (RRM), 2020 WL 1666162, at *9 (E.D.N.Y. April 4, 2020) (same).

Here, in contrast to *Goffer*, the government waited until its *fourth* application, submitted in May 2019, to reveal its misbranding investigation. Even then, it relegated to a footnote its acknowledgement that misbranding is not a predicate offense for a Title III intercept. The

government's burden is not to strategically inject footnotes into its affidavits. Its obligation is to prove that it sought the application in good faith in order to obtain evidence of a predicate offense, and that any additional evidence it gathered was incidental. It cannot do that here.

Notably, Dr. Garcia has *still* not been charged with any of the eligible offenses named in the applications, which suggests that prosecutors were "uninterested" in them all along. *United States v. Levine,* 690 F.Supp. 1165, 1171 (E.D.N.Y. 1988) ("Had the prosecutors here never used the evidence of the state offenses set forth in the original order and never attempted to prosecute such offenses, the court might infer that they were uninterested in the state crimes and had sought the eavesdropping order only to get evidence of the federal offenses."); *contrast Masciarelli,* 558 F.2d 1067, 1069 (2d Cir. 1977) (inadvertence found, in part, because "the investigation resulted in indictments charging violations of both" enumerated and unenumerated offenses). To be sure, Turpin's descriptions of the calls intercepted over Surick's cell phone lent some credence to the plausibility of a wire fraud investigation. However, the government has never had a viable legal theory for wire fraud because it cannot identify the object of the scheme—namely the money or property to which the victims were entitled. *See Binday,* 804 F.3d at 569 (wire fraud requires a scheme to defraud and money or property as the object of the scheme). The plausibility of a money laundering investigation was even more remote. Indeed, the initial application was entirely devoid of evidence that Navarro was attempting to conceal proceeds of his alleged illegal activity.

In short, the government cannot establish that it sought the Navarro wiretap in good faith. Therefore, the Court should suppress the wiretap and any evidence derived therefrom. Indeed, unless this Court and others enforce the "balance between the between the needs of law enforcement officials [and] the privacy rights of the individual," *Concepcion,* 579 F.3d at 218

(internal quotation omitted), "'Title III authorization might rapidly degenerate into … 'the electronic equivalent … of a general search warrant,'" as law enforcement agents routinely engage in "subterfuge searches." *Marion,* 535 F.2d at 701 (quoting *United States v. Brodson,* 528 F.2d 214, 215 (7th Cir. 1975) (Justice Clark)).

### E.  The Court Should Also Suppress the Derivative Fruits of the Wiretap

Should this Court suppress the Navarro wiretap, it must also suppress any evidence derived therefrom, including evidence obtained from the searches of Dr. Garcia's truck and cell phone. *See Murray v. United States,* 487 U.S. 533, 536-37 (1988) (fruit of the poisonous tree doctrine "prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search."). These searches were authorized by warrants issued in March 2020, and the applications in support of the warrants relied almost exclusively on information derived from the tainted wiretaps.

## V.

## CONCLUSION

For the reasons set forth above, this Court should order suppression of all evidence obtained or derived from the wiretap of Jorge Navarro's cell phone. Alternatively, a *Franks* hearing is required to determine whether the government recklessly omitted material information about the necessity of the wiretap from its applications.

New York, N.Y.
July 29, 2021

/s/

_____
Deborah Colson
*Attorney for Erica Garcia*