```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  12/8/2021
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

ERICA GARCIA, MICHAEL TANNUZZO, SETH FISHMAN, LISA GIANNELLI, RICK DANE, JR., JASON SERVIS, ALEXANDER CHAN, and REBECCA LINKE,

Defendants.

20-cr-160 (MKV)

OPINION AND ORDER DENYING MOTIONS TO SUPPRESS

MARY KAY VYSKOCIL, United States District Judge:

Before the Court are seven motions to suppress evidence in this case. For the reasons stated on the record at a conference on November 4, 2021 and set forth below, the motions are DENIED.

## I. BACKGROUND

The factual allegations in this case are described in detail in the Court's Opinion denying motions to dismiss the Indictment [ECF No. 450]. The Government alleges several, overlapping, years-long conspiracies to profit from the distribution and administration to race horses of non-FDA approved drugs that the defendants believed would enhance the performance of horses competing in the industry. The drugs were supposed to be undetectable in drug tests performed by members of the horse racing industry and drug regulators.

Over the course of approximately eighteen months, at least thirteen judges independently found probable cause to authorize fifteen different applications to begin or renew wiretaps, pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2522 ("T-III wiretaps"). At least ten magistrate judges found probable cause for search warrants. The early investigation of Defendants Nick Surick and Jorge Navarro, including but not limited to T-III wiretaps of their phones, established the foundation to pursue much of the

1

evidence that various defendants now challenge. The Surick wiretaps are not—and could not be—challenged by any of the defendants remaining in this case, and Navarro himself never challenged the wiretaps of his phone.

In October 2018, then-Chief Judge Colleen McMahon authorized a wiretap of Surick's cell phone, which authorization Judge Victor Marrero renewed in November 2018, and Judge William H. Pauley III renewed in December 2018 [Colson Decl. Exhibit A; Adams Decl. Exhibit A ("Dec. 20 2018 Aff.")]. The unchallenged interceptions of Surick's phone revealed a wealth of evidence that Surick and others administered to race horses, distributed, and concealed the use of performance enhancing drugs ("doping"), their efforts to elude testing and otherwise to maintain the secrecy of their doping operations, and their use of phones to accomplish these ends. For example, in intercepted calls, Surick discussed his plan to administer baking soda to particular horses to mask the presence in their urine of other prohibited substances. Dec. 20 2018 Aff. at 34–35, 47–49. He used the phone to communicate with other dopers about unannounced, out-of-competition testing by the New Jersey Racing Commission. *Id*. at 57–66. Surick also discussed the concern that people were cooperating with law enforcement and the need to avoid revealing anything incriminating. *Id*. at 36–39, 68.

The wiretaps of Surick's phone intercepted multiple communications between Surick and Navarro that provided evidence of their relationship and their participation in overlapping doping conspiracies. In one exchange, Surick told Navarro, "call me 911" to seek Navarro's advice about concealing Surrick's doping of a horse named Northern Virgin [Colson Decl. Exhibit B ("Jan. 7, 2019 Aff.") at 26]. Surick told Navarro when he had administered the drug and wanted to know "how long can't they be tested for?" because Surick was attempting to physically hide Northern Virgin from racing authorities until the drug would no longer be detectable in the

horse's blood. Jan. 7, 2019 Aff. at 27. Navarro advised Surick that he would be "good after the third day." *Id*. Surick later explained to a third person that Surick had turned to Navarro because Navarro "uses [that drug] like fucking water." *Id*. at 28 n.7.

In January 2019, the government first obtained a wiretap of Navarro's cell phone. *See* Jan. 7, 2019 Aff. The affidavit in support of that initial application described a publicly available video from YouTube in which Navarro is referred to as the "Juice Man" and appears to celebrate winning a race by using a prohibited performance enhancing drug, *i.e.* "the juice." Jan. 7, 2019 Aff. at 20–21. This initial affidavit also described a meeting at which Surick told a confidential informant about Navarro's prohibited use of the substances Aranesp and Clenbuterol. *Id*. at 20. The affidavit further included interceptions from Surick's phone in which Surick stated that he supplied Navarro with "trays of red acid," Navarro instructed Surick to "[g]rab [him] . . . 24 bottles" of a substance, and Surick and Navarro discussed Navarro's use of a "shock machine." *Id*. at 22, 23 n.6, 29.

The initial application for a wiretap of Navarro's phone devoted more than ten pages to the limitations of other investigative techniques. For example, it explained that Surick had become suspicious and ended "all communication" with the confidential informant Surick had spoken to about Navarro's doping regimen. *Id.* at 33. It explained that none of the government's confidential sources had "obtained direct access" to Navarro, and, at that point, approaching him was more likely to raise Navarro's suspicions that yield new evidence. *See id.* The affidavit went on to explain the limitations, for the investigation of this case, of physical surveillance, pole cameras, GPS tracking, financial investigations, and other techniques. *See id.* at 34–42. Every other affidavit in this case similarly explained, in detail, the progress of the investigation and the limitations of other investigative techniques.

Upon independent review, a number of judges extended the wiretap of Navarro's phone [Colson Decl. Exhibit C (Hon. Edgardo Ramos, "February 6, 2019 Aff."), Exhibit E (Hon. Deborah Batts, "March 7, 2019 Aff."), Exhibit G (Hon. George Daniels, "April 5, 2019 Aff."), Exhibit H (Hon. Loretta Preska, "May 3, 2019 Aff."), Exhibit J (Hon. Alison Nathan, "May 29, 2019 Aff.")]. Based in part on incriminating information obtained from those interceptions, a number of judges authorized wiretaps of the cell phones of Seth Fishman, Christopher Oakes, Lisa Gianelli, Jason Servis, and Kristian Rhein [Fishman Exhibit A (Hon. Edgardo Ramos, "February 14, 2019 Aff."); Oakes Exhibit 3 (Hon. Sidney Stein, "March 19, 2019 Aff."); Fishman Exhibit B (Hon. Kimba Wood, "April 17, 2019 Aff."); Glavin Decl. Exhibit 1 (Hon. Loretta Preska, "April 30, 2019 Aff."); Adams Decl. Exhibit B (Hon. John G. Koeltl, "May 16, 2019 Aff."); Colson Decl. Exhibit J (Hon. Alison Nathan, "May 29, 2019 Aff."); Glavin Decl. Exhibit 3 (Hon. Andrew Carter, "June 27, 2019 Aff."); Glavin Decl. Exhibit 4 (Hon. Ronnie Abrams, "July 30, 2019 Aff.")]. Numerous magistrate judges also authorized search warrants of, *inter alia*, Fishman's devices, email accounts, Dropbox account, home, office, and storage unit [Fishman Exhibit C, "March 29, 2019 Fishman Phone SW"), Exhibit D (Fishman Dropbox SW"), Exhibit E ("Fishman Email SW"), Exhibit F ("Fishman Premises SW"), Adams Decl. Exhibit E (January 15, 2020 Fishman SW")], and Erica Garcia's car and phone [("March 5, 2020 Vehicle SW"); ("March 27, 2020 Garcia Phone SW")].

Before the Court are seven motions to suppress evidence, filed by six defendants, some of which are joined by codefendants. Seth Fishman, joined by Gianelli, moves to suppress all wiretaps of cell phones on which he was intercepted, including Navarro's phone, and all wiretaps of his cell phone [ECF No. 439 ("Seth Fishman Mem.")]. Fishman also seeks to suppress evidence seized from searches of his home, office, and storage unit; evidence obtained from the

search of his Dropbox account; and evidence from searches of his cell phones. Gianelli also separately moves to suppress the wiretap of her phone and any other wiretaps in which she was intercepted [ECF No. 448 ("Gianelli Mem.")]. Garcia, joined by Tannuzzo and Servis, moves to suppress evidence obtained from the wiretap of Navarro's phone, and Garcia separately moves to suppress the evidence obtained from searches of her car and her phone [ECF Nos. 447 ("Garcia Wiretap Mem."); 443 ("Garcia Search Mem.")]. Servis, who joins Garcia's motion to suppress wiretap evidence from Navarro's phone, also moves to suppress wiretaps of Servis' phone and of Rhein's phone [ECF No. 457 ("Servis Mem.")]. Alexander Chan also moves to suppress the wiretaps of Servis and Rhein [ECF No. 453 ("Chan Mem.")].

Tannuzzo also filed his own submission, but he does not raise any discernible arguments for suppressing any particular evidence [ECF No. 434-1]. Like Surick and Navarro, Rick Dane Jr. and Rebecca Linke never filed or joined motions to suppress. Jordan Fishman [ECF No. 436], Christopher Oakes [ECF No. 435], and Marcos Zulueta [ECF No. 449] filed motions to suppress certain evidence but later withdrew their motions.

The government filed an omnibus brief in opposition to all of the suppression motions that had been filed [ECF No. 481 ("Gov. Opp.")]. A number of defendants filed reply briefs [ECF Nos. 508, 509, 510, 511, 512, 513]. The Court carefully reviewed all of these submissions.

During a status conference on November 4, 2021, the Court denied on the record all of the motions and stated that this opinion memorializing the Court's ruling and providing additional details about the Court's reasoning would be forthcoming [ECF No. 567 ("Nov. 4, 2021 Tr.")].

## II. DISCUSSION

The Court first addresses several common issues and thereafter addresses issues specific to individual defendants. The Court has considered all of the arguments raised in all of the suppression motions filed in this case and has concluded that none warrants the suppression of evidence or a hearing. To the contrary, based on the Court's careful review of the application for each challenged wiretap order and search warrant, there is no question that the issuing judicial officer in each instance had a substantial basis for the finding of probable cause. *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993).

### A. Common Issues

#### 1. Probable Cause

Before authorizing a T-III wiretap, a court must find "probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter." 18 U.S.C. § 2518(3)(a). Pertinent here, mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343, are predicate offenses under 18 U.S.C. § 2516. The authorizing court must also find: there is probable cause for belief that communications concerning the predicate offense will be obtained through the interception; "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous"; and "there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense . . . ." 18 U.S.C. § 2518(3)(b)–(d).

The standard for probable cause for a T-III wiretap is same as the probable cause standard for a search warrant. *United States v. Diaz*, 176 F.3d 52, 110 (2d Cir. 1999); *Wagner*, 989 F.2d at

72. It requires only that the totality of the circumstances reflects a "fair probability," but "not a *prima facie* showing, of criminal activity." *Illinois v. Gates*, 462 U.S. 213, 235, 238 (1983); *accord Wagner*, 989 F.2d at 72. The probable cause standard is "not overly strict." *United States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005). A "judge must 'simply . . . make a practical, common-sense decision.'" *Id*. (quoting *Gates*, 462 U.S. at 238). Defendants may not "dissect each piece of information in the [agent's] affidavit to show that each fact taken alone does not establish probable cause." *United States v. Gangi*, 33 F. Supp. 2d 303, 306 (S.D.N.Y. 1999). Moreover, "that an innocent explanation may be consistent with the facts as alleged . . . will not negate probable cause." *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985).

Wiretap orders and search warrants are presumed valid. *See United States v. Zapata*, 164 F.3d 620 (2d Cir. 1998) (wiretaps are presumed valid); *United States* v. *Ambrosio*, 898 F. Supp. 177, 181 (S.D.N.Y. 1995) (same) (citing *United States* v. *Fury*, 554 F.2d 522 (2d Cir. 1977), *cert. denied,* 433 U.S. 910 (1977)); *United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008) (search warrants are presumed valid). A defendant seeking suppression bears the burden to show that probable cause was lacking. *See United States v. Magaddino*, 496 F.2d 455, 459–60 (2d Cir. 1974); *Klump*, 536 F.3d at 119. A reviewing court must give "considerable deference" to the issuing court's finding of probable cause. *United States v. Concepcion*, 579 F.3d 214, 217 (2d Cir. 2009). Indeed, review is generally "limited" to whether the issuing judge had a "substantial basis" for the finding. *Wagner*, 989 F.2d at 72; *accord United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011); *see also Ambrosio*, 898 F. Supp. at 181.

Several of the defendants challenge the Navarro wiretaps, which yielded incriminating evidence against them. In the January 7, 2019 Affidavit for the initial Navarro wiretap, the government cited mail and wire fraud as predicate offenses and alleged that there was probable

7

cause to believe Navarro was engaging in "a scheme to obtain, distribute, and administer various chemical substances in order to defraud racetracks, competitors, and the betting public by placing and racing horses in races after secretly administering such substances to the racing horses." Jan. 7, 2019 Aff. at 5. This Affidavit cited, for example, the video of Navarro celebrating winning by "juic[ing]" his horse, Surick's statements about Navarro using Aranesp and Clenbuterol and about sending Navarro "trays of red acid," the exchange between Surick and Navarro about the doping and hiding of Northern Virgin, and Navarro's own statements, in intercepted conversations with Surick, about buying "24 bottles" of a substance from Surick and about using a "shock machine." *Id*. at 20–21, 22, 23 n.6, 26–29.

In challenging the Navarro wiretaps, the defendants unpersuasively attempt to "dissect" the affidavits and argue that individual pieces of evidence did not establish probable cause. *Gangi*, 33 F. Supp. 2d at 306. For example, Garcia, joined by Tannuzzo and Servis, argues that the government did not establish that the aforementioned "24 bottles" were a prohibited substance. Garcia Wiretap Mem. at 9. The government was not required to prove, in an application for a wiretap, that when Navarro said, "Grab me . . . 24 bottles," he conspired to purchase and use a prohibited substance. Jan. 7, 2019 Aff. at 29. Rather, it was required to offer evidence that, in a "totality-of-circumstances" analysis, there was a "fair probability" that Navarro was involved in a horse doping fraud scheme. *Gates*, 462 U.S. at 235, 238. The January 7, 2019 Affidavit offered evidence that Surick administered and distributed prohibited performance enhancing substances and that Surick turned to Navarro for advice about concealing his doping activity. *See* Jan. 7, 2019 Aff. at 26–29. In the light of that evidence, and the fact that Surick was ostensibly a competing trainer, and not a veterinarian, it was suspicious that Navarro instructed Surick to procure 24 bottles of any substance for him. Taken together with the "juice

8

man" video, Surick's statements about Navarro's use of prohibited substances, and other evidence in the Affidavit, the "24 bottles" conversation contributed to a "common sense" finding of probable cause. *Martin*, 426 F.3d at 74.

### 2. **Predicate Offense**

Several defendants argue that "the government did not seek the wiretaps in good faith in order to investigate an eligible, predicate offense." Garcia Wiretap Mem. at 32; *see* Seth Fishman Mem. at 2–4, 7–8; Chan Mem. at 5–6. They assert that the government was only investigating, and the wiretap affidavits only established probable cause for, drug adulteration and misbranding conspiracies, rather than mail or wire fraud conspiracies. On this basis, Garcia seeks suppression of the Navarro wiretaps, Fishman seeks suppression of the wiretap of his own phone, *see* Seth Fishman Mem. 2–4, 7–8, and Chan seeks suppression of the Servis and Rhein wiretaps in which Chan was intercepted, *see* Chan Mem. at 2, 5–6.

All parties agree that a drug adulteration and misbranding conspiracy is not among the predicate offenses enumerated in section 2516 of the wiretap statute. *See* Gov. Opp. at 33. However, the affidavits in support of the challenged wiretaps alleged, and the issuing judges found, probable cause to investigate mail and wire fraud, which are enumerated offenses. *See* 18 U.S.C. § 2516. Some of the defendants were ultimately charged with a mail and wire fraud conspiracy [ECF No. 283 ("S6 Indictment)]. Moreover, the law is clear that the government may use wiretap evidence in the prosecution of other, non-enumerated offenses, so long as the government "obtain[ed] wiretap warrants in good faith—that is, in connection with an offense for which Title III permits wiretapping—not as a subterfuge for gathering evidence of other offenses." *United States v. Rajaratnam*, 2010WL4867402, at *3 (S.D.N.Y. Nov. 24, 2010) (quoting *United States v. Marion*, 535 F.2d 697, 700 (2d Cir. 1976)). The defendants seeking

suppression have the burden to show that the issuing judges' wiretap orders were defective. *See Magaddino*, 496 F.2d at 459–60. None comes close.

Chan's challenge is frivolous. Chan, Servis, and Rhein were indicted by a federal grand jury for participating in a mail and wire fraud conspiracy. S6 Indictment ¶ 54. With respect to Garcia's challenge, the Court has already explained that the affidavits in support of the Navarro wiretaps—which cited numerous phone calls and discussions about "send[ing]" prohibited substances—supported the issuing judges' findings of probable cause to believe that Navarro was involved in the wire and mail fraud conspiracy the government alleged in the affidavits. *Supra*; Jan. Aff. 23 n.6.

Fishman fares no better. The February 14, 2019 Affidavit in support of the initial wiretap of Fishman's phone alleged that there was probable cause to believe Fishman was involved in a conspiracy to commit mail and wire fraud "relating to a scheme to . . . distribute" and "administer various chemical substances" to racehorses "to defraud racetracks, competitors, and the betting public." Feb. 14, 2019 Aff. at 6. It explained, as "background," the evidence of Surick and Navarro's "overlap[ping]" conspiracies using "interstate wires" and mails. *Id.* at 16, 24. Pertinent to the allegation of a scheme using U.S. wires and mails, the Affidavit went on to explain that Fishman had been intercepted in calls with Navarro discussing, for example, "amino acid injectable shit [Fishman had previously] sent" Navarro, the "hundreds of products" Fishman could send him, and the "invoices" for his services. *Id.* at 43–44.

To establish probable cause that Fishman was involved in the alleged overlapping doping schemes, the Affidavit also offered evidence of Navarro and Oakes discussing "this crazy fuck Seth" who "sent [Navarro] something with amino acid" he administered to a horse with the result that the "motherfucker galloped. Galloped." *Id.* at 37. In the same call, since "Seth" was in

"Dubai" at the time," Oakes suggested his own "drench" with "amino acids" that "works just like the good stuff and zero chance you get caught," even though you "give it race day." *Id.* at 38, 39. The Affidavit also cited evidence from confidential sources about purchasing drugs that were created and sold by Seth Fishman, including a powerful painkiller known as the "Fishman Pain Shot." *Id.* at 18–19, 46–47.

Fishman argues that the affidavits did not establish probable cause for the predicate fraud scheme because there was no evidence that he would receive "purse money" when horses drugged with his products won races, nor that he had "a betting interest" in any particular race. Fishman Mem. at 8. His theory is unpersuasive. The Court has no basis to conclude that "good faith" in seeking a wiretap order required the government to suspect the particular payment structure Fishman now theorizes would be necessary. *Rajaratnam*, 2010WL4867402, at *3. The government was investigating a conspiracy, and members of conspiracies can have different roles and profit in different ways—in for a penny, in for a pound. *See Pinkerton v. United States*, 328 U.S. 640, 646 (1946). The affidavit in support of the initial Fishman wiretap offered evidence that Fishman sent Navarro drugs and "invoices" for drugs that made Navarro's horses "gallop[.]" Feb. 14, 2019 Aff. at 43–44. In the light of the other evidence in the affidavit, the government had a good faith basis to investigate Fishman for participating in scheme, using the mails and wires, to defraud racetracks, competitors, and the betting public. *Id.* at 6. Fishman's unsupported speculation that the government was really only investigating him for misbranding all along does nothing to change this analysis.

Fishman falls back on arguing that the government failed to establish probable cause that he was involved in a fraud scheme because the affidavits did not establish that his custom drugs were prohibited substances. Fishman argues that his conduct could have been innocent because

11

he is a veterinarian "in the business of creating and distributing substances to improve the health and performance of horses." Fishman Mem. at 19. For example, Fishman attempts to explain away interceptions in which he touts the benefits of his custom "epo mimetic" by arguing that he was "describing a custom made product intended to mimic the benefits of Epogen, *presumably* without the chemical content of the banned substance." *Id.* at 20 (emphasis added). Fishman's arguments are unpersuasive.

As explained above, the "quanta of proof" required "is 'only the probability, and not a *prima facie* showing, of criminal activity.'" *Wagner*, 989 F.2d at 72 (quoting *Gates*, 462 U.S. at 235). As the February 14, 2019 Affidavit explained, several states prohibit giving horses any performance-enhancing substance within close proximity to a race, not merely substances that are specifically prohibited. Feb. 14, 2019 Aff. at 19–20. The Affidavit offered evidence that individuals who engaged in prohibited horse doping described and used Fishman as a source of helpful drugs. *See id.* at 18, 37–39, 46–47. Moreover, Fishman was intercepted peddling his "hundreds of products" without inquiring about specific horses' medical needs. *Id.* at 43–44. As such, the judges who authorized the wiretapping of Fishman's phone had a "substantial basis" for thinking Fishman's conduct was that of a drug dealer, rather than a vet. *Wagner*, 989 F.2d at 72. Fishman asks the Court to "presum[e]" that his custom drugs were not prohibited substances and were not sold "in order to enhance performance during a particular race." Fishman Mem. at 20. However, "that an innocent explanation may be consistent with the facts as alleged . . . will not negate probable cause." *Fama*, 758 F.2d at 838. Fishman's challenge to the wiretap of his phone therefore fails.

12

### 3. Alternative Investigative Techniques

The defendants also challenge the Navarro wiretaps and other wiretaps that incriminated them on the ground that the government had failed to exhaust alternative investigative techniques. Their arguments are wholly unpersuasive. Before authorizing a wiretap, a court must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3). However, "the Government is not required to exhaust all conceivable investigative techniques before resorting to electronic surveillance." *United States v. Concepcion*, 579 F.3d 214, 218 (2d Cir. 2009) (internal quotation marks and citation omitted); *see United States v. Miller*, 116 F.3d 641, 663 (2d Cir. 1997) (no requirement that any particular investigative procedures be exhausted). The government must simply "inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *Diaz*, 176 F.3d at 110; *see United States v. Scala*, 388 F. Supp. 2d 396, 404 (S.D.N.Y. 2005) ("a reasoned explanation, grounded in the facts of the case, and which squares with common sense, is all that is required"). Furthermore, as with a finding of probable cause, a reviewing court owes deference to the issuing judge's determination that a wiretap was necessary. *United States v. Gigante*, 979 F. Supp. 959, 963 (S.D.N.Y. 1997); *see also United States v. Trippe*, 171 F. Supp. 2d 230, 236 (S.D.N.Y. 2001) ("While generalized or conclusory statements in an application are insufficient to support a showing of necessity, the application must be viewed in a practical and common sense manner and need be only minimally adequate to support the issuing judge's determination of necessity.").

Notwithstanding the defendants' posturing, wiretaps are a valid investigative technique when this requirement is met. The law in this Circuit is clear that wiretapping is appropriate to

13

investigate conspiracies where "the clandestine nature of alleged conspiracies makes them relatively less susceptible to normal investigative techniques." *United States v. Feola*, 651 F. Supp. 1068, 1105 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989); *see also Concepcion*, 579 F.3d at 218. Moreover, "wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation." *United States v. Fleishman*, No. 11-cr-32 (JSR), 2011 WL 4000987, at *3 (S.D.N.Y. Aug. 31, 2011) (quoting *United States v. Steinberg*, 525 F.2d 1126, 1130 (2d Cir. 1975)).

In each application for a wiretap, the government devoted numerous pages to explaining its use of alternative investigative techniques, including the use of confidential informants and physical surveillance, and the limitations of such techniques in this case. For example, in January 7 Affidavit for the Navarro wiretap, the government explained that it had developed confidential informants, but Surick, cognizant of the need for secrecy, had ended "all communication" with one such source. Jan. 7, 2019 Aff. at 33. Moreover, the government explained, none of the confidential sources had gotten close to Navarro and approaching him at that point was more likely to raise his suspicions than yield information. *Id*. Affidavits in support of other wiretap applications cited this and additional evidence that the conspirators were cognizant of the need to maintain secrecy. For example, the affidavits in support of the initial Fishman and Servis wiretaps quoted Navarro cutting off a call with Fishman to avoid speaking "in front of people." Feb. 14, 2019 Aff. at 44; April 30, 2019 Aff. at 44; *see also* April 17 Aff. at 55–56, 56–57 (Fishman and Giannelli discussing whether they can "trust" a potential customer, Fishman explaining, "I didn't want to talk to him [a potential customer] too much because I didn't know if he was trustworthy."). The April 30, 2019 Affidavit in support of the initial Servis wiretap also quoted Servis and Navarro, intercepted on Navarro's phone, describing efforts to

14

physically hide and "lock[] up" certain drugs and delaying a delivery, stating "I'm afraid to bring it over." April 30, 2019 Aff. at 53.

Certain defendants insist that the government should have been required to do more drug testing or more extensively investigate financial records. However, the government is not required to exhaust any particular avenue of investigation before seeking a wiretap. *Miller*, 116 F.3d at 663. Moreover, as various affidavits made clear, the conspirators were using drugs that were designed to be undetectable by racing industry drug tests and went to great lengths to avoid creating financial or other records. *See* February 14, 2019 Aff. at 30–32, 49–60; April 17 Aff. at 97–113; April 30 Aff. at 73–75.

### 4. Material Omissions

Several defendants argue that certain affidavits were misleading and seek suppression of the evidence obtained as a result or a *Franks* hearing to demonstrate that the evidence should be suppressed. A defendant may "undermine the validity" of a wiretap order or search warrant by attacking the truthfulness of the underlying affidavit. *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003) (citing *Franks v. Delaware*, 438 U.S. 154 (1978)). To invoke the *Franks* doctrine, the defendant must demonstrate that there were intentional misstatements or omissions in the affidavit and that those misstatements or omissions were material. *See Awadallah*, 349 F.3d at 64. The defendant bears the burden of establishing both components—i.e., intent and materiality—by a preponderance of the evidence. *See Klump*, 536 F.3d at 119. Not every statement in an affidavit must be true. *See United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000). And alleged omissions are subject to a lower level of scrutiny. *United States v. Rivera*, 750 F. Supp. 614, 617 (S.D.N.Y. 1990).

The Second Circuit has explained that "[t]he *Franks* standard is a high one." *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991). Even to obtain a hearing, a defendant must make a "substantial preliminary showing" not only that the affidavit reflects a "deliberate falsehood or . . . reckless disregard for the truth," but also that the intentional false statement or omissions "was necessary to the judge's finding of probable cause." *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008). "[T]he mere intent to exclude information is insufficient . . . [since] every decision not to include certain information in the affidavit is 'intentional' insofar as it is made knowingly." *Awadallah*, 349 F.3d at 67–68. To infer that an affiant acted with reckless disregard for the truth, the omitted information must be "clearly critical" to assessing the legality of the search. *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996). An affiant "does not necessarily act with 'reckless disregard for the truth' simply because he or she omits certain evidence that a reviewing court, in its judgment, considers to be 'clearly critical.'" *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) (emphasis omitted). In all events, moreover, "[i]f the corrected affidavit supports probable cause, the inaccuracies were not material . . . and suppression is inappropriate." *Canfield*, 212 F.3d at 718.

The Court has carefully reviewed each challenged affidavit and argument regarding an alleged material misstatement or omission. The Court finds that none of the defendants' arguments merits suppression or a hearing. Servis and Chan raise the only argument that merits further explanation, which the Court provides below.

## B. Individual Issues

### 1. Servis and Chan

Servis and Chan, in particular, attack the wiretaps of Servis's phone on the ground that the applications were materially misleading in their descriptions of the substances SGF-1000 and

Clenbuterol. They argue the affidavits misleadingly described SGF-1000 as "growth factor." They stress that, sometime before the final extension of the Servis wiretap, the government learned that a test conducted by the Hong Kong Jockey Club showed that SGF-1000 did not contain growth hormone or any other banned substance. However, their argument about the negative Hong Kong Jockey Club has no bearing on the initial authorization for the Servis wiretap on April 30, 2019, nor at least one extension of the wiretap. Their arguments fall far short of the standard to hold a *Franks* hearing, let alone suppress evidence.

Having reviewed each of the affidavits in support of the Servis wiretap orders, the Court finds that they were not misleading. The affidavits in support of the applications for wiretaps of Servis' phone contain evidence that Servis believed that SGF-1000 did contain prohibited substances that were, nevertheless, not detectable by racing industry tests. They set forth lengthy exchanges in which Servis and Rhein discuss negative tests of SGF-1000. *See* June 27 Aff. at 72–77 (Rhein explaining that the U.S. Jockey Club suspected that SGF-1000 was a performance enhancing drug but did not have a test for it). In light of this evidence, a negative test from the Hong Kong Jockey Club was not material because it was simply another negative test for a drug that the defendants believed to be undetectable. *See Canfield*, 212 F.3d at 718 ("If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate.").

The arguments about Clenbuterol are even weaker. Servis argues the affidavits misstate in minor ways various states' particular restrictions. Moreover, while Servis focuses on the permissible uses of Clenbuterol, he ignores evidence that he discussed using an irregular form of the drug with Navarro. *See* April 30 Aff. at 52–53 (Navarro and Servis discussing whether regulatory authorities would find merely the "regular" Clenbuterol or "the other one," "not . . .

the regular," and Servis stating that "when the dust settles [he would] like to get some" of the irregular Clenbuterol). The affidavits were not required to show that Servis violated a particular racing rule but only to establish a "fair probability," *Gates*, 462 U.S. at 235, that he was involved in the alleged horse doping fraud scheme. The affidavits were sufficient.

2. **Fishman**

The Court has already rejected Fishman's challenges to the wiretaps of his phone. *Supra*. Fishman's challenges to the search warrants for his electronic devices, email accounts, Dropbox account, and certain physical premises are even less persuasive. He asserts that the government failed to establish a connection between Fishman and the searched email and Dropbox accounts. Fishman Mem. at 22. However, as the application for the email search warrant explained, Fishman was intercepted in a phone call providing one of the email addresses to a coconspirator. Fishman Email SW at 31–33. Another email address bore his name and the name of his company. *Id.* at 34–36. With respect to the Dropbox account, the mobile application for the account was on Fishman's phone, and he is quoted referring to it in an intercepted phone call. Fishman Dropbox SW at 23–25. The evidence in the search warrant affidavits was more than sufficient. The Court has considered all of Fishman's other arguments and concludes that there is no basis to suppress any of the evidence against him.

3. **Garcia**

Finally, Garcia argues that the physical search of her car, pursuant to a search warrant, was invalid because the application for the warrant contained "stale" evidence. Garcia Search Mem. at 1. The Court rejects this argument because the affidavit for the warrant presented evidence that Garcia was long involved in an ongoing conspiracy. *See Diaz*, 176 F.3d at 109. Staleness analysis depends on the nature of the alleged crime. *United States v. Gallo*, 863 F.2d

185, 191 (2d Cir. 1988). Where an affidavit presents "a picture of continuing conduct, as opposed to an isolated instance of wrongdoing . . . the passage of time between the last described act and the presentation of the application becomes less significant." *Id.*

The affidavit in support of the warrant for Garcia's car detailed her long-term relationship with Navarro and ongoing involvement with members of his doping scheme. It described at least six instances over the span of four months in which Garcia discussed with Navarro administering prohibited substances to racehorses. *See generally* Garcia March 5, 2020 Vehicle SW. The affidavit acknowledged that Garcia's relationship with Navarro deteriorated in early 2019. *Id.* ¶ 10(b). It explained that, nevertheless, Garcia remained in touch with other members of Navarro's network, including his assistant trainer. *Id.* In the light of the evidence of Garcia's longstanding and continuing involvement in a doping operation, there was probable cause to search her vehicle, notwithstanding her personal break with Navarro. *See Diaz*, 176 F.3d at 109; *Gallo*, 863 F.2d at 191. In all events, moreover, the government clearly relied on the warrant in good faith. *See United States v. Leon*, 468 U.S. 897, 922 (1984).

## CONCLUSION

For the foregoing reasons, as previously ordered on the record of the November 4, 2021 status conference, the motions to suppress are DENIED.

**SO ORDERED.**

**Date: December 8, 2021**
**New York, NY**

*[signature: Mary Kay Vyskocil]*
**MARY KAY VYSKOCIL**
**United States District Judge**